UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SKINNER, INC.,
    Plaintiff,

v.                                                      CIVIL ACTION NO. 20-11402-MPK[1]

LUCHENG LI, MAOLIANG FANG, *et al.*,
    Defendants.

MEMORANDUM AND ORDER ON PLAINTIFF'S
MOTION TO DISMISS COUNTERCLAIM (#44).

KELLEY, U.S.M.J.

I. Introduction.

On July 24, 2020, Skinner, Inc., an auction house, filed an interpleader complaint against Lucheng Li and others, alleging that they submitted suspicious funds to Skinner on behalf of Li in connection with his purchase of a vase at a June 18, 2020 auction. (#1.) Through this litigation, Skinner learned that Li had made the winning bid of $1,330,000 on behalf of Maoliang Fang. (#35 ¶¶ 11, 13-14.) Skinner alleged that Li and Fang failed to make full and timely payment on the vase as required by its Conditions of Sale, and that they caused unknown third parties to submit over 160 separate payments to Skinner. *Id.* ¶¶ 20-21, 26.

Li and Fang filed a counterclaim, alleging that their purchase was not solely governed by the Conditions of Sale and that the parties had agreed to allow Fang additional time to submit payment in full. (#40 ¶¶ 27, 34-35.) They also claim that the purchase was not subject to sales tax,

---

[1] With the parties' consent, this case was assigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (#61.)

1

which Skinner charged; that they submitted 28 separate payments for the vase, not 160; and that they ultimately paid more than was due on the vase. *Id.* ¶¶ 16-17, 22, 28-30, 43. Skinner filed a motion to dismiss the counterclaim, which Li and Fang oppose. (##44, 48, 51). For the reasons set out below, Skinner's motion to dismiss the counterclaim is denied in part and allowed in part.

## II. Legal Standard.

"In assessing whether counts in [d]efendants' [c]ounterclaims survive a motion to dismiss, the [c]ourt treats them the same way it would treat counts in a plaintiff's complaint." *Fossa, Ltd. v. Lin*, No. 16-cv-11914-LTS, 2017 U.S. Dist. LEXIS 162258, at *8 (D. Mass. Sep. 29, 2017). Dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) is inappropriate if the complaint satisfies Rule 8(a)(2)'s requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11-12 (1st Cir. 2011); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Detailed factual allegations are unnecessary; Rule 8(a)(2) only requires sufficient detail to provide a defendant with fair notice of a plaintiff's claim and the bases for it. *Twombly*, 550 U.S. at 555.

Yet a plaintiff is only entitled to relief if the complaint's factual allegations raise the stated right to relief above a speculative level. *Twombly*, 550 U.S. at 555. To survive a Rule 12(b)(6) motion, a complaint must allege enough facts to state a claim that is "plausible on its face." *Id*. at 570; *see Iqbal*, 556 U.S. at 678. A complaint "has facial plausibility" when it alleges enough facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see Twombly*, 550 U.S. at 556. This is not a "probability requirement" but demands "more than a sheer possibility that a defendant acted unlawfully." *Iqbal*, 556 U.S. at 678; *see Twombly*, 550 U.S. at 556.

In reviewing a motion to dismiss under Rule 12(b)(6), the court must "separat[e] a complaint's factual allegations from its legal conclusions." *Ocasio-Hernández*, 640 F.3d at 10. Factual allegations are entitled to a presumption of truth; legal conclusions are not. *Id.*; *see Iqbal*, 556 U.S. at 678. Determining whether a complaint states a facially plausible claim is a "context-specific task that requires the . . . court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see Ocasio-Hernández*, 640 F.3d at 11. If the court "can[no]t infer from the well-pleaded facts 'more than the mere possibility of misconduct,' then the complaint has not shown 'that the pleader is entitled to relief.'" *Justiniano v. Walker*, 986 F.3d 11, 19 (1st Cir. 2021) (citation omitted) (quoting *Iqbal*, 556 U.S. at 679).

### III. <u>Factual Background.</u>

Li is an art agent residing in the United Kingdom and Fang is an art dealer residing in China. (#40 ¶¶ 1-2.) Previously, in September 2017, Li won an item at a Skinner auction. *Id.* ¶ 4. When Skinner sent Li an invoice that included sales tax, Li informed Skinner that the sale was exempt because the item would be shipped out of the country. *Id.* ¶¶ 5-6. Skinner then removed the charge for sales tax from the invoice. *Id.* ¶ 7.

More recently, on June 18, 2020, Skinner held an auction where a blue and white vase ("Vase") was advertised with an estimated value of between $5,000 and $10,000. (#40 ¶¶ 8-9.) Several days prior, Skinner approved Li to participate in the auction. *Id.* ¶ 13. Based on terms Li found on Skinner's website, he believed that if he or Fang did not pay for any item(s) won within 35 days of purchase, they would face a 1.5% interest charge as well as a 1.5% storage charge for any item(s) left at Skinner's premises for more than 3 days after purchase. *Id.* ¶ 10. In addition, he understood that breach of the terms of sale would result in Skinner selling the item(s) won at a subsequent auction and recouping costs of that auction and any deficiency in a later sale from the

breaching purchaser. *Id.* ¶ 11. However, defendants allege that these terms, also outlined in Skinner's Conditions of Sale, were not intended to be the exclusive agreement between them. *Id.* ¶ 35.

During the auction, Li submitted bids for the Vase on behalf of Fang and won it after entering a final bid for $1,330,000 (the "hammer price"). (#40 ¶ 14.) Fang planned to resell the Vase and to pay Li a commission for its purchase. *Id.* ¶¶ 47-48. The day after the auction, Skinner sent Li an invoice for $1,709,031.25, which included the hammer price, various charges, and sales tax. *Id.* ¶ 15. Li told Skinner that the Vase would be shipped out of the country to a foreign purchaser, so that the Vase would be exempt from sales tax. *Id.* ¶¶ 16-17, 22. In spite of this, Skinner did not adjust its invoice to deduct the $100,531.25 charge for sales tax. *Id.* ¶ 23. After the sale, Li asked Skinner for additional information about the provenance of the Vase and to inspect it, but Skinner refused both requests. *Id.* ¶¶ 18-21.

On June 24, 2020, nearly a week after the auction, Skinner notified Li that if payment was not received by the following day, the Vase would be offered to the next highest bidder. (#40 ¶ 24.) Defendants allege that this changed the terms of purchase set forward on Skinner's website because they were not given 35 days in which to pay for the Vase, and that the request for immediate payment was also inconsistent with industry custom and Li's previous dealings with Skinner. *Id.* ¶ 25. For example, defendants allege on information and belief that Skinner did not require other buyers of items with an unexpectedly high hammer price to pay in full on the date of purchase. *Id.* ¶ 26.

Defendants allege that, on June 24, 2020, Li made a payment arrangement with Skinner, whereby Fang caused $1,720,440.00 to be sent to Skinner's bank account in twenty-eight separate

4

transactions between June 24, 2020, and June 30, 2020. (#40 ¶¶ 27-29.)[2] On June 30, 2020, Li received an updated invoice that did not reflect all the payments Fang had caused to be made. *Id.* ¶¶ 32-33. On and after that date, Li contacted Skinner to confirm receipt of all the payments and to schedule a date to collect the Vase, but he was unsuccessful. *Id.* ¶ 38. It is defendants' belief that Skinner failed to properly account for the payments that Fang caused to be made, leading to its incorrect conclusion that defendants did not pay in full by June 30th. *Id.* ¶ 43.

Defendants assert that they complied with the Conditions of Sale and that Skinner did not notify them that they were in breach of the agreement or that they planned to cancel the sale. *Id.* ¶¶ 36-37. It was not until July 14, 2020, when Skinner's counsel contacted Li, that he learned Skinner had concerns about the propriety of the multiple payments Fang had caused to be made to Skinner. *Id.* ¶¶ 39, 44. Skinner's counsel informed Li that it was cancelling the sale of the Vase for breach of contract, citing inappropriate activities and "a possible scam." *Id.* ¶ 44.[3]

Skinner filed an interpleader action on July 24, 2020, naming Li and the unknown third parties who had submitted the separate payments, and claiming that Li had breached its Conditions of Sale. (#40 ¶ 45; #1.)[4] Several months later, in October 2020, Skinner sold the Vase to a third party at a subsequent auction for $1,272,500. (#40 ¶ 46.)

---

[2] In its complaint, Skinner states that it received only $1,486,095.00 and that over 160 separate payments were sent by unknown third parties, not 28. (#35 ¶¶ 26, 30.)

[3] The scam alleged by Skinner relates to the 160 separate payments it received from unknown third parties, which included a payment of $2,934 sent by a couple in Georgia who later complained to Skinner that they had been directed to send Skinner this amount to receive savings on their utility bills. (#35 ¶¶ 26, 28.) Another payment of $26,000.00 was returned for insufficient funds. *Id.* ¶ 29.

[4] Skinner later amended its complaint to remove its count for interpleader and to add Fang as a defendant. (#35.) As the court noted in its order allowing amendment, Skinner had refunded the payment made by the couple in Georgia but was unable to identify the third parties responsible for the additional payments. (#34 at 2.)

IV. Discussion.

1. Consideration of Materials Outside of Counterclaim.

One exception to the general rule that the court may not consider documents outside the complaint on a motion to dismiss is when documents are sufficiently referred to in the complaint or are central to the pleader's claim. *Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001); *see Trans-Spec Truck Service, Inc. v. Caterpillar*, 524 F.3d 315, 321 (1st Cir. 2008) ("Exhibits attached to the complaint are properly considered part of the pleading 'for all purposes,' including Rule 12(b)(6)."). "When, as now, a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998).

Defendants refer to the Conditions of Sale throughout their counterclaim and recite its terms in support of their allegations. *See, e.g.*, #40 ¶¶ 10-12, 25, 34-37, 42. By its terms, the Conditions of Sale binds anyone who bids on an item. (#35-1 at 3.) Defendants' allegations are expressly linked to and dependent on the Conditions of Sale, therefore the court will consider it in deciding Skinner's motion to dismiss. *See Beddall*, 137 F.3d at 17. The emails defendants attached to their counterclaim are between Li and representatives for Skinner, and are dated June 24, 2020, and July 2, 2020. (#40 ¶¶ 22, 32; *id.* at pp. 29-31, 33.) This correspondence is directly related to defendants' allegations regarding modifications to the terms of their agreement with Skinner. *See, e.g.*, #40 ¶¶ 24-25, 27. It is therefore appropriate for the court to consider the correspondence, which was attached to the counterclaim, in deciding Skinner's motion to dismiss. *See Trans-Spec*, 524 F.3d at 321.

2. Count I: Breach of Contract.

Defendants allege that Skinner engaged in several breaches of an agreement between the parties which they claim incorporates the Conditions of Sale, terms on Skinner's website, and the parties' post-auction communications and conduct. Skinner argues that the parties' agreement is limited to its Conditions of Sale. (#45 at 9.)

"Under Massachusetts law, a breach of contract claim requires the plaintiff to show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *In re Bos. Univ. Covid-19 Refund Litig.*, 511 F. Supp. 3d 20, 23 (D. Mass. 2021) (quoting *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013)). "For a breach-of-contract claim to survive a motion to dismiss, the complaint 'must do more than allege, in a conclusory fashion, that the defendant breached the contract.'" *Michel v. LoanCare, LLC*, No. 21-cv-11018-FDS, 2022 U.S. Dist. LEXIS 21149, at *8 (D. Mass. Feb. 7, 2022) (quoting *Hogan v. Teamsters Local 170*, 495 F. Supp. 3d 52, 58 (D. Mass. Sept. 30, 2020)). "Instead, it must allege, with 'substantial certainty,' the specific contractual obligation that the defendant breached." *Id.* (quoting *Hogan*, 495 F. Supp. 3d at 58).[5]

In Massachusetts, "interpretation of a contract, including the determination of ambiguity, is a question of law." *Zotbelle, Inc. v. Kryolan Corp.*, 416 F. Supp. 3d 33, 46 (D. Mass. 2019). "Should the court find the contract language unambiguous, we interpret it according to its plain terms." *Id.* (quoting *Bank v. Int'l Bus. Machines Corp.*, 145 F.3d 420, 424 (1st Cir. 1998)).

---

[5] The court notes again that while factual allegations are entitled to a presumption of truth, legal conclusions are not. *Iqbal*, 556 U.S. at 678. For example, the court is not required to accept as true defendants' repeated legal conclusions that Skinner "breached the contract between the parties." *See, e.g.*, #40 ¶¶ 52-59.

7

"Contract language is 'considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference[s] of opinion as to the meaning of the words employed and obligations undertaken.'" *Id.* (alteration in original) (quoting *Rey v. Lafferty*, 990 F.2d 1379, 1384 (1st Cir. 1993)).

As an initial matter, the Conditions of Sale indicates that it "shall be governed by the laws of the Commonwealth of Massachusetts" and that "[b]idding on any item indicates your acceptance of these terms and all other terms printed within, posted, and announced at the time of sale whether bidding in person, through a representative, by phone, by Internet, or other absentee bid." (#35-1 at 3.) Defendants do not dispute that either term applies.[6] The Conditions of Sale also provides that "[a]ll merchandise purchased must be paid for and removed from the premises the day of the auction" and that Skinner "may impose, and the purchaser agrees to pay, a monthly interest charge of 1.5% of the purchase price of any lot or item lot not paid for within thirty-five (35) days of the date of sale." *Id.* at 2.

Defendants' allegation that the Conditions of Sale provides a 35-day grace period for making payments is expressly contradicted by the terms of the agreement, which provide that "merchandise purchased must be paid for . . . the day of the auction." (#35-1 at 2.) "[I]t is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *Yacubian v. United States*, 750 F.3d 100, 108 (1st Cir. 2014) (quoting *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 229 n.1 (1st Cir. 2013)); *see also Bank*, 145 F.3d at 424 (instructing courts to interpret contracts according to their plain terms). What defendants attempt to frame as a grace period is, instead, a penalty for failing to pay in full

---

[6] In their briefings, the parties agree that Massachusetts law applies to defendants' claims. *See* #45 at 6; #48 at 6 n.2.

at the time of purchase. The interest fee penalty is, like other penalties for breach outlined in the Conditions of Sale, an option that Skinner may exercise at its discretion. (#35-1 at 2 (noting that Skinner "may" charge the interest fee); *id.* (identifying potential options in the event of a breach, including cancelling the sale and/or selling the item at a subsequent auction).[7] These terms are unambiguous: payment is required on the day of purchase, while any late payments may be assessed a 1.5% interest fee or result in cancellation of the sale. *See Zotbelle, Inc.*, 416 F. Supp. 3d at 46. Defendants admit that they did not initiate payment until nearly one week after their purchase. (#40 ¶¶ 27-28.)

The terms defendants identify from Skinner's website are identical to those contained in the Conditions of Sale. *Compare* #35-1; *with* #40 ¶¶ 10-11, 50. Defendants also expressly refer to the Conditions of Sale being "pos[t]ed on [Skinner's] website." (#40 ¶ 56.) Having failed to identify any terms on Skinner's website separate from those in the Conditions of Sale, defendants have not plausibly alleged that Skinner proffered any written terms apart from the Conditions of Sale at the time Li made the winning bid on Fang's behalf on June 18, 2020. *See Rinsky v. Trs. of Bos. Univ.*, No. 10-cv-10779-NG, 2010 U.S. Dist. LEXIS 136876, at *36 (D. Mass. Dec. 27, 2010)

---

[7] The full text describing these additional options reads:

> If the purchaser breaches any of its obligations under these Conditions of Sale, including its obligation to pay in full the purchase price of all items for which it was the highest successful bidder, Skinner Inc. may exercise all of its rights and remedies under the law including, without limitation, (a) canceling the sale and applying any payments made by the purchaser to the damages caused by the purchaser's breach, and/or (b) offering at public auction, without reserve, any lot or item for which the purchaser has breached any of its obligations, including its obligation to pay in full the purchase price, holding the purchaser liable for any deficiency plus all costs of sale.

(#35-1 at 2.)

(dismissing complaint where plaintiff cited various materials without identifying which purported terms they contained).

Instead of relying exclusively on the Conditions of Sale, defendants ask the court to look at industry practice and Skinner's past course of conduct with other buyers, alleging that Skinner allowed others to submit payment in full after the date of purchase where the hammer price was unexpectedly high. (#40 ¶¶ 25-26.) Extrinsic evidence, however, such as evidence of the parties' "prior course of dealing" or industry practice, is generally limited to use when contract terms are ambiguous. *Sax v. DiPrete*, 639 F. Supp. 2d 165, 171 (D. Mass. 2009). It can be used "to 'interpret' even a seemingly unambiguous contract, but not to vary or contradict its terms." *Id.* (quoting *Fleet Nat'l Bank v. H&D Entm't, Inc.*, 96 F.3d 532, 539 (1st Cir. 1996)). This is precisely what defendants ask the court to do: use extrinsic evidence to elide the Conditions of Sale's express requirement that payment in full be made on the day of purchase. *See id.*; *Transcanada Power Mktg. Ltd. v. Narragansett Elec. Co.*, 542 F. Supp. 2d 127, 138 (D. Mass. 2008) ("The intentions and understandings of the parties prior to or at the time of the execution of the contract may not be considered to vary its terms.").

Next, defendants claim that Skinner modified the terms of its Conditions of Sale after the auction by agreeing to allow defendants to pay for the Vase on a "payment plan." (#48 at 11.) In support, defendants cite to the email correspondence from June 24, 2020, which was attached to their counterclaim. (#40 ¶ 22; *id.* at pp. 29-31.) In essence, defendants assert that the parties either modified the terms of the Conditions of Sale after the auction or that Skinner waived the payment terms outlined in the Conditions of Sale.

"While one party cannot unilaterally change the terms of a contract, parties can expressly or impliedly agree to a modification. Mutual agreement as to a modification of the contract may

'be inferred from the conduct of the parties and from the attendant circumstances of the instant case.'" *IBM v. Merlin Tech. Sols., Inc.*, No. 06-cv-40174-FDS, 2008 U.S. Dist. LEXIS 134380, at *7-8 (D. Mass. Feb. 15, 2008) (citation omitted) (quoting *Cambridgeport Sav. Bank v. Boersner*, 597 N.E.2d 1017, 1022 (Mass. 1992)). "The subsequent course of conduct must be of 'such specificity as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document.' A subsequent course of conduct must explicitly address the contract provision in order to modify the parties' agreement." *KBQ, Inc. v. E.I. du Pont de Nemours & Co.*, 6 F. Supp. 2d 94, 99 (D. Mass. 1998) (citation omitted) (quoting *Haft v. Dart Group Corp.*, 841 F. Supp. 549, 568 (D. Del. 1993)).

Like modification, conduct can similarly establish waiver of a contract term. "Conditions and clauses of a contract may be waived, either expressly or by words and conduct." *Owen v. Kessler*, 778 N.E.2d 953, 957 (Mass. App. Ct. 2002). In *Owen*, the Massachusetts Court of Appeals cited cases in which "a waiver was established by the conduct of the parties as they continued to deal after the expiration of the deadline" and in which "a waiver was established by the acceptance of payments and continued dealings between the parties after the deadline." *Id.* (first citing *McCarthy v. Tobin*, 706 N.E.2d 629 (Mass. 1999); then citing *Church of God in Christ, Inc. v. Congregation Kehillath Jacob*, 353 N.E.2d 669 (Mass. 1976)).

As alleged, Skinner waited until six days after the auction and five days after issuing its invoice to remind defendants that payment in full was expected at the time of purchase. Yet the June 24, 2020 email correspondence defendants cite indicates that Skinner did not, in fact, accept their proffered payment plan or promise defendants additional time to pay for the Vase. Instead, Skinner repeatedly told Li that it required "payment in full," that it "can not [sic] allow you to make any down payment . . . before remitting full payment," and that "[o]ur . . . [C]onditions of

[S]ale clearly state that payment is due at the time the invoice[] is incurred therefore we would need you to make full payment immediately." (#40 at 30.) Rather than show that Skinner agreed to a payment plan, these emails show that Skinner repeatedly demanded that defendants make immediate payment in full. These emails also refute defendants' allegation that Skinner did not notify them of their breach of the Conditions of Sale. *See Yacubian*, 750 F.3d at 108.

Skinner's alleged post-June 24, 2020 conduct, however, may support a finding that it modified or waived the timing requirement in its Conditions of Sale. Defendants suggest that Skinner's acceptance of their 28 payments was an acceptance of a delayed payment plan, but they have only alleged that Fang caused payments to be submitted directly into Skinner's account, without any affirmative actions on Skinner's part to accept them. In contrast, defendants' allegation that Skinner sent a revised invoice reflecting its application of those payments against defendants' balance plausibly alleges that Skinner accepted the delayed payments and intended to allow defendants to submit additional payment(s) to complete their purchase.[8] *See* #40 at ¶ 32; *id.* at p. 33 (July 2, 2020 email from Skinner to Li, noting receipt of funds and stating that "[o]nce paid in full," Li could schedule shipment of the Vase).

Lastly, defendants cite a number of purported breaches regarding Skinner's failure to deliver the Vase after payment was made in full; Skinner's cancellation of the sale and failure to return defendants' payments; and Skinner's sale of the Vase to a third party after cancelling the sale to defendants. Whether these were breaches of an agreement depend on whether Skinner had, in fact, agreed to allow defendants additional time to render payment on the Vase. These allegations therefore survive the motion to dismiss. As for defendants' claim that Skinner breached

---

[8] Again, the parties disagree as to whether defendants ever submitted payment in full for the Vase. Where defendants allege that they did, (#40 ¶ 29), for the purposes of this motion, the court must assume that defendants did so. *See Iqbal*, 556 U.S. at 678.

an agreement by filing suit, defendants have not identified a contractual provision that would render the filing of a lawsuit to be a breach of the Conditions of Sale or any other agreement between the parties.

Defendants have plausibly alleged that Skinner may have waived or modified the payment terms contained in the Conditions of Sale through its conduct, therefore defendants' breach of contract claim (Count I), as limited by the court's discussion above, survives Skinner's motion to dismiss.

### 3. Count II: Breach of the Implied Covenant of Good Faith and Fair Dealing.

Defendants have also brought a claim for breach of the implied covenant of good faith and fair dealing. (#40 ¶¶ 63-75.) In support of their claim, defendants state that Skinner breached the implied covenant by failing to abide by its promise to accept defendants' payment plan; by failing to treat defendants as Skinner treated other buyers; by not accepting payment during the 35-day "grace period"; by charging sales tax on a foreign purchase; by failing to properly account for payments made on the Vase; by suing defendants after receiving payment in full; and by cancelling the sale. *Id.* Skinner seeks to dismiss this claim on the grounds that defendants have not alleged any acts of bad faith inconsistent with its rights under the Conditions of Sale. (#45 at 14.)

"Every contract in Massachusetts is subject, to some extent, to an implied covenant of good faith and fair dealing. This implied covenant may not be 'invoked to create rights and duties not otherwise provided for in the existing contractual relationship,' but rather concerns the manner of performance." *Ayash v. Dana-Farber Cancer Inst.*, 822 N.E.2d 667, 685 (Mass. 2005) (citations omitted) (quoting *Uno Rests., Inc.* v. *Boston Kenmore Realty Corp.*, 805 N.E.2d 957, 964 (Mass. 2004)); *see Uno Rests., Inc.*, 805 N.E.2d at 966 (stating that "the covenant of good faith and fair dealing does not serve to impute greater rights or impose impractical duties not contemplated in

the contractual relationship"). "Nor does the covenant apply where the defendant has exercised an express contractual power in good faith—that is, in a manner that comports with the parties' reasonable expectations as to performance." *Banco Do Brasil, S.A. v. 275 Wash. St. Corp.*, 750 F. Supp. 2d 279, 295 (D. Mass. 2010) (quoting *Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005)).

A breach of the implied covenant "requires 'conduct taken in bad faith either to deprive a party of the fruits of labor already substantially earned or unfair leveraging of the contract terms to secure undue economic advantage.'" *Blue Hills Office Park LLC v. J.P. Morgan Chase Bank*, 477 F. Supp. 2d 366, 374-375 (D. Mass. 2007) (quoting *Christensen v. Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 226 (D. Mass. 2005)); *see Bosque v. Wells Fargo Bank, N.A.*, 762 F. Supp. 2d 342, 353 (D. Mass. 2011) ("In order to prevail on this claim, plaintiffs must show that defendant 'acted with . . . dishonest purpose or conscious wrongdoing necessary for a finding of bad faith or unfair dealing.'" (quoting *Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 730 (1st Cir. 1996))). "Harms suffered in a breach of the implied covenant of good faith and fair dealing generally involve deceit or 'unfair subterfuge' and usually are 'compounded by deceptive or unfair behavior that prevented—or at a minimum diverted—the injured parties from seeking immediate redress.'" *Blue Hills Office Park LLC*, 477 F. Supp. 2d at 383 (quoting *Christensen*, 360 F. Supp. 2d at 226).

As noted above, the Conditions of Sale did not provide for a grace period, nor did it prevent Skinner from filing suit against a buyer. Defendants' allegations that these actions were in violation of the implied covenant of good faith and fair dealing fail. *See Ayash*, 822 N.E.2d at 685. Allegations that Skinner agreed to modify its payment terms through its conduct on and after June 30th, only to later cancel the sale and sell the Vase to a third party, however, do support this claim

in suggesting that Skinner agreed to modify its payment terms only to later change its mind without notice to defendants. *See Bosque*, 762 F. Supp. 2d at 353 ("Although the complaint does not allege that defendant acted with a dishonest purpose or deliberate wrongdoing, it does detail a series of defendant's actions and omissions that undermined its ability to perform under the [agreement] and meet plaintiffs' performance expectations."). In addition, allegations that Skinner failed to properly account for payments that Fang caused to be made, resulting in Skinner's belief that Fang failed to pay in full, would support a finding that Skinner's performance was contrary to the parties' reasonable expectations. *See id.*; *Banco Do Brasil, S.A.*, 750 F. Supp. 2d at 295.

Defendants also claim that Skinner improperly charged sales tax on the Vase, even though Li reminded Skinner that the vase would be exempt because it was being shipped out of the country. (#40 ¶¶ 16-17, 22.) One of the terms of the Conditions of Sale requires buyers to provide documentation if they want to claim an exemption from Massachusetts sales tax. (#35-1 at 3 ("Sales in Massachusetts . . . are subject to the . . . current sales tax[]. Dealers, museums, and other qualifying parties may be exempt from sales tax upon submission of proper documentation.").) Defendants do not allege that they provided any documentation, only that they told Skinner the sale was exempt. (#40 ¶ 16 ("Li informed [Skinner] that the Vase was sold to a foreign purchaser and would be shipped out of the United States."); *id.* ¶ 22 ("On multiple occasions . . . Li informed [Skinner] that . . . Massachusetts sales tax should not be charged.").)[9] Yet defendants do allege that Skinner refused to provide "advice or information relative to submitting appropriate documentation to secure a waiver of Massachusetts sales tax." (#40 ¶ 70.) Although not specifically alleged, the court will draw the reasonable inference that defendants actually asked

---

[9] Although defendants cite a 2017 sale in which Skinner did not charge sales tax on an item shipped to a foreign address, they do not allege that the Conditions of Sale were the same in 2017 or that Li did or did not provide documentation on that occasion. *See* #40 ¶¶ 4-7.

15

Skinner to identify what documentation was required in order to claim the exemption under the Conditions of Sale. *See Iqbal*, 556 U.S. at 678. By failing to provide this information or to remove the sales tax (which was over $100,000) from the invoice, defendants have plausibly alleged that Skinner was seeking an unfair advantage. *See Blue Hills Office Park LLC*, 477 F. Supp. 2d at 374-375.

As limited here, defendants' breach of the implied covenant of good faith and fair dealing (Count II) remains.

### 4. Count III: Chapter 93A.[10]

Defendants' final claim is an alleged violation of Chapter 93A, §§ 2 and 11. (#40 ¶¶ 76-85.) They allege that Skinner engaged in unfair and deceptive conduct by failing to honor the 35-day "grace period"; threatening to cancel the sale when payment was not received; charging sales tax where the sale should have been exempt; deeming funds received to be suspicious without any evidence; refusing to permit inspection of the Vase; engaging in faulty accounting practices; and cancelling the sale.

"A practice is unfair if it is 'within . . . the penumbra of some common-law, statutory, or other established concept of unfairness; [or] . . . is immoral, unethical, oppressive, or unscrupulous. . . .'" *Blue Hills Office Park LLC*, 477 F. Supp. 2d at 376 (quoting *Linkage Corp. v. Trustees of Boston Univ.*, 679 N.E.2d 191, 209 (Mass. 1997)). "[V]iolations of ch. 93A must meet a higher standard of liability than do breaches of an implied covenant of good faith and fair

---

[10] Skinner notes in passing that defendants failed to serve a demand letter in support of their Chapter 93A claim. (#45 at 17.) However, defendants were not required to serve a demand letter because their claim was asserted in a counterclaim. *See* Mass. Gen. Laws ch. 93A, § 9(3) ("The demand requirements of this paragraph shall not apply if the claim is asserted by way of counterclaim . . . or if the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth . . . .").

16

dealing." *Formulatrix, Inc. v. Rigaku Automation, Inc.*, 344 F. Supp. 3d 410, 430 (D. Mass. 2018) (quoting *PH Group Ltd. v. Birch*, 985 F.2d 649, 652 (1st Cir. 1993)). "[A] mere breach of contract, without more, does not amount to a violation of G. L. c. 93A." *Beverly v. Bass River Golf Mgmt., Inc.*, 93 N.E.3d 852, 863 (Mass. App. Ct. 2018). But, as "[t]he Supreme Judicial Court has said[,] . . . 'conduct in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice for [Chapter] 93A purposes.'" *Blue Hills Office Park LLC*, 477 F. Supp. 2d at 376 (final alteration in original) (quoting *Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806, 821 (Mass. 1991)).

Once again, defendants' allegations regarding the "grace period" are inconsistent with the Conditions of Sale and, without more, cannot support a claim under Chapter 93A. As to their allegation that Skinner threatened to cancel the sale when payment was not received by June 24, 2020, this conduct was consistent with the Conditions of Sale, which required payment in full. Defendants have not shown that, as of June 24th, 2020, Skinner wavered on its insistence that defendants immediately pay in full, so that defendants have failed to plausibly allege that Skinner's threat to enforce its options for breach under its Conditions of Sale was either unfair or deceptive.

Defendants also allege that Skinner denied Li's post-auction requests for information about the provenance of the Vase and to inspect the Vase. (#40 ¶¶ 19-21.) The Conditions of Sale states that "[a]ll property is sold 'as is.'" (#35-1 at 2.) The Conditions of Sale does not set forth a buyer's right to inquiries as to provenance or a right of inspection after purchase. *See id.* at 2-3. Nor do defendants allege that Skinner made any separate promises regarding their ability to inspect the Vase or make inquiries about it after the auction. These bare allegations that Skinner refused defendants' requests fail to support a claim that Skinner acted unfairly or deceptively.

17

Claims that Skinner charged sales tax on a purchase that should have been exempt and engaged in faulty accounting practices plausibly allege a level of unfair or deceptive practices in securing a benefit for Skinner that it was not entitled to receive from defendants. Lastly, defendants claim that Skinner deemed suspicious the funds that Fang caused to be submitted without any evidence to support that conclusion. Although Skinner identifies the basis for its suspicions in its complaint, the court is limited to the allegations in defendants' counterclaim at this stage, and must therefore deny Skinner's motion to dismiss the Chapter 93A claim (Count III). *See Iqbal*, 556 U.S. at 678.

V. Conclusion.

For the reasons discussed herein, Skinner's motion to dismiss defendants' counterclaim (#44) is DENIED in part and ALLOWED in part.

March 10, 2022

/s/ M. PAGE KELLEY
M. Page Kelley
Chief United States Magistrate Judge