UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SKINNER, INC.,
Plaintiff,


v.                                    CIVIL ACTION NO. 20-11402-MPK[1]


LUCHENG LI, MAOLIANG FANG,
Defendants.



**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT (#85), DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (#88),
PLAINTIFF'S MOTION TO STRIKE MAOLING FANG'S ERRATA SHEET (#101), AND
DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S MOTION TO STRIKE (#109)**


KELLEY, U.S.M.J.

**I.    Introduction.**

This case involves the auction of a blue and white Yongzheng lotus-mouth vase (the

"Vase") by plaintiff Skinner, Inc., an auction house located in Marlborough, Massachusetts.  On

June 18, 2020, defendant Maoliang Fang, an art dealer located in China, through his agent,

defendant Lucheng Li, located in the United Kingdom, won the Vase with a final bid of

$1,330,000.  After the hammer fell, a series of events unfolded that thwarted the sale and ultimately

led to this lawsuit.

In their claims and counterclaims, both parties allege that the other (i) breached the

Conditions of Sale ("COS") that controlled the parties' relationship during the auction and sale,

---

[1] With the parties' consent, this case was assigned to the undersigned for all purposes, including
trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (#61.)

(ii) breached the covenant of good faith and fair dealing, and (iii) violated M.G.L. c. 93A § 11.  In its amended complaint (#35), plaintiff also included claims for intentional misrepresentation and declaratory judgment.  Plaintiff moved to dismiss defendants' counterclaims, and in its order on the motion, the court narrowed their scope.  (#67.)  Defendants did not move to dismiss plaintiff's claims, so they remain as pled in the amended complaint.  (#35.)

Before the court are the parties' cross-motions for summary judgment (##85, 88), plaintiff's motion to strike Mr. Fang's errata sheet (#101), and defendants' motion to strike plaintiff's motion to strike (#109).  The court heard argument on all four motions on January 5, 2023.  (#118.)  For the following reasons, Skinner's motion for summary judgment (#85) is allowed in part and denied in part; defendants' motion for summary judgment (#88) is denied; and both motions to strike (##101, 109) are denied.

## II.   <u>Undisputed Material Facts.</u>[2]

### A.  The Parties.

Skinner is an auction house and appraiser located in Marlborough, Massachusetts.  (#87 ¶ 1; #107 (undisputed).)

Mr. Fang is a Chinese national living in China.  (#87 ¶ 17; #107 (undisputed).)  Before his deposition in this case, Mr. Fang had never communicated with Skinner, either orally or in writing. *Id.*

---

[2] The facts are derived from defendants' Statement of Material Facts in support of its motion for summary judgment (#88-2); Skinner's Statement of the Undisputed Material Facts in support of its motion for summary judgment (#87); Skinner's response to defendants' Statement of Material Facts and its further Statement of Additional Undisputed Material Facts (#104); defendants' response to Skinner's Statement of Undisputed Material Facts (#107); defendant's further Statement of Disputed Facts submitted in response to Skinner's further Statement of Additional Undisputed Material Facts (#114); and, where appropriate, the underlying evidence submitted by the parties.

Mr. Li is a Chinese national and an art agent with a place of business in Middlesborough, UK. (#88-2 ¶ 1; #104 ¶ 1; #87 ¶¶ 19-20; #107 (undisputed).)  He has worked for Mr. Fang since 2015, acting as his agent and bidding on his behalf in foreign art auctions approximately ten times per year.  (#87 ¶¶ 19-20; #107 (undisputed).)  When acting as Mr. Fang's agent, Mr. Li does not determine what to bid on; he acts solely in accordance with Mr. Fang's instructions.  (#88-2 ¶ 5; #104 ¶ 5.)

Before the auction of the Vase in June 2020, Mr. Li had made one purchase from Skinner, on behalf of a client, in September 2017.  (#87 ¶ 22; #107 (undisputed).)  Mr. Li paid for the item within four days and submitted an authorized release form, including information that he was using an MC/DOT preferred shipper, which made clear that the item qualified for a sales tax exemption. (#87 ¶ 23; #107 (undisputed).)  After receiving the full payment for the item, minus sales tax, and the appropriate paperwork to support the exemption, Skinner released the item to Mr. Li and his client via the shipper.  (#87 ¶ 24; #107 (undisputed).)

### B.  The 2020 Auction of the Vase and the Operative Conditions of Sale.

Skinner listed the Vase in its Asian Works of Art online auction to be held on June 18, 2020, valuing the item between $5,000 and $10,000.[3]  (#87 ¶ 16; #107 ¶ 16; #88-2 ¶¶ 1-2; #104 ¶¶ 1-2.)  On June 16, Mr. Li registered for the auction.  (#87 ¶ 25; #107 ¶ 25 (not disputing registration date).)  As part of his registration, Mr. Li acknowledged his agreement of the COS, as all bidders are required to do.  *Id.*  Mr. Li claims he does not recall doing so.  (#88-2 ¶ 12; #104 ¶ 12.)  But, the parties agree—and the court already has ruled (#67 at 6)—that the COS controlled the parties' relationship throughout the auction and sale.  (#40 ¶¶ 10-12, 25, 34-37, 42 (citing COS

---

[3] The Asian Works of Art online auction took place June 9-18, 2020.  (#87 ¶ 16.)  The auction of the Vase occurred on June 18, 2020, as part of the broader Asian Works of Art Online Auction. (#87 ¶ 16; #107 ¶ 16.)

terms throughout counterclaims); #67 at 9 ("The terms defendants identify from Skinner's website are identical to those contained in the [COS].").)  They provide, in relevant part:

2.      All property is sold "as is" . . . . (#87 ¶ 7; #107 ¶ 7; #91-1 at Ex. 12 §2.)

[ . . .]

4.      All merchandise purchased must be paid for and removed from the premises the day of the auction. . . .  (#87 ¶ 9; #107 ¶ 9; #91-1 at Ex. 12 §4.)

[ . . .]

6.      If the purchaser breaches any of its obligations under these Conditions of Sale, including its obligation to pay in full the purchase price of all items for which it was the highest successful bidder, Skinner Inc. may exercise all of its rights and remedies under the law including, without limitation, (a) canceling the sale and applying any payments made by the purchaser to the damages caused by the purchaser's breach, and/or (b) offering at public auction, without reserve, any lot or item for which the purchaser has breached any of its obligations, including its obligation to pay in full the purchase price, holding the purchaser liable for any deficiency plus all costs of sale.  (#87 ¶ 10; #107 (undisputed); #91-1 at Ex. 12 §6)

[ . . .]

9.      Sales in Massachusetts, Florida, and New York are subject to the respective current sales taxes.  Dealers, museums, and other qualifying parties may be exempt from sales tax upon submission of proper documentation.  (#87 ¶ 13; #107 ¶ 13; #91-1 at Ex. 12 §9.)

[ . . .]

11.     Bidding on any item indicates your acceptance of these terms and all other terms printed within, posted, and announced at the time of the sale whether bidding in person, through a representative, by phone, by Internet, or other absentee bid. (#87 ¶ 4; #107 (undisputed); #91-1 at Ex. 12 § 11.)

Before the auction, Mr. Li requested from Skinner's Asian Art Department information about the Vase's condition, to which Skinner responded with the requested explanations and photographs.  (#87 ¶ 26; #107 (undisputed); #91-1 at Exs. 15, 23)  Two days later, on June 18, 2020, Mr. Li, acting on behalf of Mr. Fang, won the Vase with a bid of $1,330,000 (the "hammer price").  (#87 ¶¶ 29, 30; #107 ¶ 29, (¶ 30 undisputed).)

### C.  Payments for the Vase.

Shortly after the auction,[4] Skinner sent Mr. Li an invoice for $1,709,031.25, including the hammer price, various charges, and $100,531.25 in sales tax.  (#87 ¶ 30; #107 (undisputed).)  The invoice included Skinner's bank information for wires, its address for checks, and a website link that included further information about payments, sales tax, and shipping.  (#87 ¶ 31; #107 (undisputed).)  The day after the auction, June 19, Mr. Li forwarded the invoice to Mr. Fang.  (#87 ¶ 33; #107 ¶ 33.)  Neither Mr. Li nor Mr. Fang made any payments on the Vase before June 24, 2020.  (#87 ¶¶ 32, 34; #107 (¶ 32 undisputed), ¶ 34.)  Instead, following his winning bid on June 18, Mr. Li sent an email to Skinner that same day requesting additional information regarding the Vase, this time related to its provenance. (#87 ¶ 34; #107 ¶ 34.)  Skinner did not respond.  *Id.*

Mr. Li and Skinner did not communicate again until June 24, on which date Mr. Li (i) conversed with William Debordes Jackson, of Skinner's Accounts Receivable Department, via telephone (#87 ¶ 36; #107 (undisputed)), and (ii) emailed Judith Dowling, of Skinner's Asian Art Department, requesting additional information regarding the Vase's provenance and condition (#88-2 ¶ 36; #104 ¶ 36).

As to (i), Mr. Debordes Jackson followed the telephone call with an email dated June 24, 2020, stating that Skinner would not allow Mr. Li to make a down payment or inspect the item before completing full payment, and demanding payment in full.  (#87 ¶ 37; #107 (undisputed); #92-1 at Ex. 32.)  Mr. Li responded the same day, stating that he understood Mr. Debordes Jackson's message, that he would make payment in full without inspecting the lot, and that he would "aim to make full payment within the next week, because the Chinese Dragon Boat Festival would . . . delay payment this week."  (#87 ¶ 38; #107 (undisputed); #92-1 at Ex. 33.)  If Skinner

---

[4] The parties dispute whether Skinner sent the invoice on June 18 or June 19.  For reasons stated *infra* n. 19, the dispute is not material.

was concerned, Mr. Li continued, he would "transfer 300,000 USD immediately to [Skinner's] bank account." *Id.* Mr. Li also requested the final invoice without sales tax "[b]ecause [the Vase] would be ship[ped] out of [the] US." (#88-2 ¶ 40; #104 ¶ 40; #92-1 at Ex. 33)  In response, Mr. Debordes Jackson explained that Skinner's COS "clearly state that payment is due at the time the invoices [sic] is incurred" and that Mr. Li must "make full payment immediately" or else the Vase may be offered to the underbidder (#87 ¶ 39; #107 ¶ 39; #92-1 Ex. 33), to which Mr. Li replied that he would "do the transfer now" and send the receipt "later on"  (#87 ¶ 40; #107 (uncontested); #92-1 Ex. 33).

As to (ii), Ms. Dowling responded to Mr. Li's email on June 24, 2020, with an unequivocal demand for full payment: "If you have not made arrangements with our accounting department for the payment of [the Vase] . . . by the end of the day tomorrow, June 25, 2020, I am offering the [Vase] to the under bidder."  (#87 ¶ 41; #107 (undisputed); #92-1 at Ex. 34.)  That same day, Mr. Li sent a receipt for a partial payment of $300,000 that he claimed to have sent "from a bank in UK" and stated that it "should . . . arrive in [Skinner's] bank account within 3 days."[5] (#92-1 at Ex. 35.)  As he did with Mr. Debordes Jackson, Mr. Li promised Ms. Dowling that the rest would be sent from a Hong Kong bank following the Dragon Boat Festival on Monday, June 29. *Id.* The $300,000 wire arrived in Skinner's bank account five days later, on June 29, but no other payments did.  (#87 ¶ 42; #104 ¶ 42.)  The Bank of America record indicates that the payment originated with the Yongquan Trading Co., Limited.  (#93-1 at Ex. 37 p. 25.)

---

[5] Mr. Li also responded to Ms. Dowling with an email stating that he would send his "business partner Mr. Chen" to Skinner's office "today to make the payment as soon as possible." (#89 at App. 504.)  Mr. Li attached Mr. Chen's Massachusetts ID to the email. *Id.* Neither party refers to this correspondence, and the parties have not directed the court to any evidence showing whether Mr. Chen arrived at Skinner as promised.

The next day, June 25, Mr. Li sent to Skinner a wire receipt for $640,000 that was purportedly transferred that day, and again promised that "[t]he rest of the amount 668,500 would be transferred on next Monday," June 29, following the Dragon Boat Festival.  (#87 ¶ 44; #107 (undisputed); #92-1 at Ex. 36.)  The $640,000 payment never arrived in Skinner's bank account, and the remainder amount of $668,500 did not arrive on June 29.[6]  (#87 ¶ 45; #107 ¶ 45.)

 Continuing the pattern, on June 26, Mr. Li sent another wire receipt, this one for $200,000.  (#87 ¶ 47; #107 (undisputed).)  After receiving this third wire receipt and on Ms. Keane's advice, Ms. Dowling emailed Mr. Li stating, "We await confirmation of your full payment."  (#87 ¶ 48; #107 (undisputed); #92-1 at Exs. 39, 40.)  Four days later, on June 30, 2020, Skinner received an unannounced wire in the amount of $700,000, also from the Yongquan Trading Co., Limited.  (#87 ¶ 55; #107 ¶ 55.)  Also on June 30, Mr. Li sent wire receipt images for two additional transfers in the amount of $295,049 and $7,000, both of which Skinner's bank averred it never received.[7]  (#87 ¶¶ 67-72; #107 ¶¶ 67-72.)  The $200,000 payment arrived in Skinner's account on July 2, it too originating from the Yongquan Trading, Co., Limited.  (#87 ¶ 47; #107 (undisputed).)

Also between June 26 and June 30, Skinner received approximately 150 small payments—each between a few hundred to two or three thousand dollars—via money orders, personal checks, and one cash deposit.  (#87 ¶ 56; #107 (undisputed); ##94-1 – 96-1 at Ex. 45.)  The payments were made by numerous payors, none of whom Mr. Fang or Mr. Li knew, and many of whom Skinner

---

[6] Plaintiff claims that Mr. Li promised a $668,500 wire, and that no such payment ever arrived in Skinner's bank account.  (#87 ¶¶ 44-45.)  But, Mr. Li did not promise to send the remainder as a single wire (although he promised it would all arrive on June 29) and, unlike the $640,000 payment, he never sent a wire receipt for that amount as of that date.  (#92-1 at Ex. 36.)

[7] Defendants claim that the $7,000 wire was deposited on June 28, 2020, citing a cropped photograph of a deposit receipt.  (#89 at App. 129.)  Defendants do not dispute that the $295,049 wire never arrived.  (#87 ¶ 67; #107 ¶ 67.)

could not identify due to illegible or incomplete information on the transfer slips.  (#87 ¶¶ 58-60; #107 ¶¶ 58-59 (¶ 60 undisputed); ##94-1 – 98-1 at Exs. 45-46)  The payments totaled $113,451 and $111,940; Skinner credited them to defendants' account, as reflected in an invoice sent to defendants' counsel dated July 8, 2020. (#88-2 ¶ 52; #104 ¶ 52.)  The situation was "unusual and unprecedented at Skinner," as "no one at Skinner can remember a situation even similar factually to this one over the course of Skinner's decades in business."  (#87 ¶ 61; #107 ¶ 61.)

During the same period, Skinner also received a $26,000 check that was returned for insufficient funds, and then resubmitted successfully on July 9, 2020.  (#87 ¶ 57; #107 ¶ 57.)  On July 2, 2020, Mr. Li contacted Skinner, stating that "one of our friends in the US" had overpaid Skinner by $111,940 via ten payments by "mistake."  (#87 ¶ 62; #107 (uncontested).)

Mr. Li claimed that by June 30 he had sent Skinner the entire invoice less sales tax, amounting to $1,608,500.  (#99-1 at Ex. 55.)   As of July 9, however, Skinner had only received $1,429,399—$279,632.25 less than the total invoice price and $179,101 less than the invoice price without sales tax.[8]  (#87 ¶ 65; #107 ¶ 65; #89 at App. 525-29 (June invoice that does not yet reflect the undisputed $26,000 check clearance on July 9).)

### D.  Defendants' Foreign Payment Agent.

As it turned out, neither Mr. Li nor Mr. Fang were "involved in making any payments to Skinner for the [Vase]."  (#87 ¶ 50; #107 ¶ 50; #104 ¶ 17 (plaintiff's additional facts); #114 ¶ 17.)  Because Mr. Fang was living in Shanghai, which defendants claim restricts currency transfers outside of China, he required the assistance of third parties outside of China to facilitate

---

[8] Skinner cites internal records demonstrating defendants had paid $1,418,391 by July 9 (#92-1 at Ex. 31), and defendants cite the July 8 invoice demonstrating that they had paid $1,429,399 (if calculated to include the $26,000 payment that the parties agree was credited the following day) (#89 at App. 525-529).  The difference is not material to the issues, so the court will recognize the information included on the June 8 invoice.

international payments.  (#88-2 ¶ 27; #104 ¶ 27.)  So, Mr. Fang enlisted an agent named Yangfeng

Liu to complete his payments to Skinner.[9]  (#87 ¶ 51; #107 (undisputed).)  Defendants identified

Mr. Liu in their amended initial disclosures, noting his contact information as "London, U.K.

(Address and Phone number unknown)."  (#87 ¶ 52; #107 (undisputed); #99-1 at Ex. 5.)  Their

arrangement worked as follows:  Mr. Liu would arrange to make payments to Skinner and would

communicate to Mr. Fang that those payments had been made; Mr. Fang would then send payment

information, including receipts, to Mr. Li; Mr. Li would send those receipts to Skinner; and then

Mr. Fang would send payment to Mr. Liu.  (#87 ¶¶ 53-54; #107 (undisputed).)

### E.  Mr. Li Requests Confirmation of Receipt of Payment and Deduction of Sales Tax.

Defendants' payments were paralleled by a voluminous back-and-forth in which Mr. Li

sought (i) confirmation of Skinner's receipt of his wires, and (ii) an invoice deducting sales tax.

As noted above, Mr. Li first requested an invoice without sales tax in an email to Mr. Debordes

Jackson dated June 24, 2020, in which he explained that the Vase was to be shipped out of the

United States.  (#88-2 ¶ 40; #104 ¶ 40.)  Ms. Keane received Mr. Li's email but did not respond to

him.  (#88-2 ¶ 40; #104 ¶ 40; #89 at App. 246-47; #92-1 at Ex. 33.)

On June 29, and twice on June 30, Mr. Li emailed Skinner to confirm receipt of pending

wire transfers.  (#88-2 ¶ 49; #104 ¶ 49.)  On June 30, Ms. Keane emailed Mr. Li promising to send

an email "at the close of the business day reflecting any credits to [his] account."  (#104 ¶ 62

(plaintiff's additional facts); #114 ¶ 62; #105-1 at Ex. 98.)  Later that same day, Mr. Debordes

---

[9] Mr. Fang typically used another agency in Hong Kong, Sheng Zuan Logistics Company, to arrange for international payments and shipping, but here he used Mr. Liu.  (#88-2 ¶ 29; #104 ¶ 29.)  He had worked with Mr. Liu six or seven times in the past for this purpose.  (#88-2 ¶ 32; #104 ¶ 32.)

Jackson emailed Mr. Li an updated invoice[10] (#104 ¶ 66 (plaintiff's additional facts); #114 ¶ 66.), followed by an email confirming the updated invoice had been sent and stating that "as of 6/30/20 we have not received your payments of $200,000.00, $295,049.00.  We post and reconcile wire deposits every morning.  You will receive an email confirmation once your invoice has been paid in full."  (#104 ¶ 67 (plaintiff's additional facts); #114 ¶ 67.)

Skinner emailed the invoice again on July 1 (#104 ¶ 68; #105-1 at Ex. 100 (attached invoice not in record as cited but indicated on face of email); #114 ¶ 68 (disputing attached invoice existed and also claiming invoice was identical to the one sent on June 30)), and Mr. Debordes Jackson again followed that invoice with a separate email, this time requesting further information regarding the purported wires of $200,000 and $295,049.  (#104 ¶ 69 (plaintiff's additional facts); #114 ¶ 69; #105-1 at Ex. 101.)  Mr. Li responded the same day, stating that the wires should have arrived already and asking Mr. Debordes Jackson to "[p]lease check your account regularly." (#88-2 ¶ 64; #104 ¶ 64; #89 at App. 492.)

The next day, July 2, Skinner notified Mr. Li that "[f]unds ha[d] now been posted to [his] account" for a total amount paid to date of $1,117,451 and informed him that "[o]nce paid in full" he was welcome to schedule a contact-less pickup.[11]  (#104 ¶ 70 (plaintiff's additional facts); #114

---

[10] Defendants dispute the accuracy of Skinner's invoice.  They argue that Skinner "did not confirm receipt of sums that had been wired and failed to accurately reflect credits to the account," but they cite no evidence demonstrating that Skinner did not apply payments that it had received and processed from defendants as of that date.  (#114 ¶ 66.)

[11] Defendants dispute the accuracy of the amount reflected in Skinner's email, claiming that by July 2, Skinner had received $1,425,391, not $1,117,451 as the July 2 email indicates.  (#114 ¶ 70.) As support, they cite two undated invoices Skinner sent to Mr. Li reflecting the higher amount and payments received through July 2.  *Id.*; #89 at App. 525-535.  The invoices do not reflect, however, when those payments were processed and posted to Mr. Li's account.

¶ 70.)  Mr. Li quickly followed up requesting an "updated invoice once [Skinner] received 295,049 USD and 200,000 USD."  (#88-2 ¶ 64; #104 ¶ 64; #89 at App. 489.)

On July 6,[12] Mr. Li called Skinner's Accounts Receivables department and, receiving no response, again emailed Ms. Keane, noting that "My client need[s] the vase ship[ped] out ASAP." (#88-2 ¶ 64; #104 ¶ 64; #89 at App. 135.)  Ms. Keane responded, informing Mr. Li that receipts received over the holiday weekend would be posted the following day, July 7, and that Mr. Debordes Jackson would be reaching out to him with any updates at that time.  (#88-2 ¶ 64; #104 ¶ 64; #89 at App. 490.)  He also emailed Mr. Debordes Jackson on July 6 seeking confirmation that Skinner had received the "full payment."  (#88-2 ¶ 64; #104 ¶ 64; #89 at App. 485.)

The next day, July 7, Mr. Li promptly emailed Ms. Keane (#88-2 ¶ 67; #104 ¶ 66 (responding to ¶ 67); #89 at App. 490) and the Accounts Receivable Department (i.e. Mr. Debordes Jackson) (#88-2 ¶ 64; #104 ¶ 66 (responding to ¶ 67); #89 at App. 493) requesting an update on the status of his full payment.  In his email to Accounts Receivable, Mr. Li also asked Skinner to remove the sales tax from his updated invoice and provided, for the first time, documentation verifying that the Vase would not be subject to Massachusetts sales tax.  (#88-2 ¶ 55; #104 ¶ 55; #89 at App. 493.)  Ms. Keane directed Mr. Debordes Jackson not to respond to Mr. Li because she had delegated the investigation into Mr. Li's payments to Kristina ("Tina") Sutton, Skinner's CFO. (#89 at App. 519.)

Also on July 7, Mr. Li began communicating with Skinner through counsel.  (#87 ¶ 90; #107 (undisputed).)  On July 8, Skinner's counsel, Martin Desmery, sent to William Wei, one of Mr. Li's three attorneys, a copy of the latest invoice and deposit report, which credited Mr. Li's

---

[12] July 4, 2020 fell on a Saturday, so the federal holiday was observed on Friday, July 3, meaning Skinner's business was closed from July 3 through Sunday, July 5.  (#104 ¶ 71 (plaintiff's additional facts); #114 ¶ 71 (not disputing the observance of a federal holiday).)

account $1,403,409.  (#88-2 ¶ 71; #104 ¶ 70 (responding to defendants' ¶ 71); #89 at App. 525-29.)  The invoice included the small payments discussed above and continued to list Massachusetts sales tax.  *Id.*

### F.  Victims of Fraud Contact Skinner.

Amid the flurry of payments and communications, on July 6, an individual named Deepa Luthra, wife of Sanjeev Kumar, contacted Skinner via telephone to explain that she had been contacted on July 1 or 2, 2020, by a company called "Utility Savings Expert" who told her that she could pay her utility bill through Skinner.  (#87 ¶ 81; #107 (undisputed).)  She reported that she had arranged for a cashier's check with her husband's name to be deposited into Skinner's Bank of America account in the amount of $2,934, (#87 ¶ 82; #107 ¶ 82 (disputing evidentiary foundation that check bore Mr. Kumar's name); #104 ¶ 40 (plaintiff's additional facts); #114 ¶ 40 (not disputing name on check)), but was now worried that she had been misled.  (#87 ¶ 83; #107 (undisputed).)  She followed up via email, *id.*, as did her husband, who corresponded with Ms. Sutton via email between July 8 and 13, 2020.  (#87 ¶ 84; #107 (undisputed).)  Both Ms. Luthra and Mr. Kumar's bank, SunTrust, and Skinner's bank, Bank of America, opened an investigation into the potential fraud.  (#87 ¶ 85; #107 (undisputed).)  When the investigation concluded, on or around September 28, 2020, Bank of America determined that the "transaction was unauthorized" and debited Skinner's account for the payment by Ms. Luthra and Mr. Kumar, returning it to SunTrust.  (#104 ¶ 44 (plaintiff's additional facts); #114 ¶ 44; #99-1 at Ex. 69, 70.)[13]

---

[13] Defendants dispute paragraph 44, noting only that the "letter from Bank of America states that it was advised that the transaction was unauthorized," apparently contesting that the transaction actually was found to be unauthorized and not the authenticity of the communication itself.  (#114 ¶ 44.)  The letter states both that Bank of America was informed the transaction may be unauthorized and that "[t]he transaction was unauthorized," resulting in a deduction from Skinner's account in the amount of $2,934.  (#99-1 at Exs. 69, 70.)

On July 8, Ms. Keene had a conversation with John Pajka at Bank of America in which she claims Mr. Pajka recommended canceling the sale of the Vase because of how defendants' payments had come in.  (#88-2 ¶ 74; #104 ¶ 73 (responding to defendants' ¶ 74); #104 ¶ 45 (plaintiff's additional facts); #114 ¶ 45 (disputing the substance of the conversation, but not that it occurred).)  Mr. Pajka also advised Skinner that if individuals came forward claiming fraud, Skinner would be liable.  (#87 ¶ 88; #107 (undisputed).)

### G.  The Deal Comes to an End.

As discussed above, beginning on July 7, Mr. Li began communicating with Skinner exclusively through counsel.  (#87 ¶¶ 89-90; #107 (undisputed).)  On that date, Mr. Li's counsel sent Skinner an email stating that Mr. Li had paid $1,720,440, asserting that this was an overpayment of $111,940, and seeking to confirm that his client could arrange to have a verified shipping company pick up the Vase no later than July 10, 2020.  (#87 ¶ 90; #107 (undisputed).)  Also on July 7, U.S. Art Company contacted Skinner to arrange to remove the Vase for shipment to China on July 10, 2020.  (#87 ¶ 80; #107 (undisputed).)  Skinner advised them that the Vase had not been fully paid for and could not be removed.  *Id.*; #105-1 at Ex. 104.

The next day, Mr. Desmery responded to Mr. Li's counsel with an updated invoice reflecting a remaining balance on his account. (#89 at App. 524-35.)  As mentioned above, this invoice still included Massachusetts sales tax.  *Id.*  A colloquy ensued via email, text, and phone over the following days and finally, on July 10, Mr. Li's counsel informed Mr. Desmery via text that his "client will suffer $1 million in damages if this isn't handled in time.  That's a problem for you and me."  (#87 ¶ 91; #107 ¶ 91 (citing plaintiff's exhibits Exs. 72-81 as evidence of counsel's communications); #99-1 at Ex. 74.)  Counsel also sent Mr. Desmery an email stating that "we have an emergency," once again requesting that he call him.  (#87 ¶ 91; #107 ¶ 91; #99-1 at Ex. 75.)

Later that day, Friday, July 10, Mr. Desmery emailed Mr. Li's three attorneys, Mr. Wei, Bari Zahn, and Robert Zausmer, stating that he was "done with this circus," and informing them that "Skinner ha[d] decided to cancel the sale. But it will take time on Monday to connect with the client and bankers, so if you have a proposal I suggest you put it in writing and deliver by Monday morning," July 13. (#89 at App. 521.) As directed, over the weekend Mr. Zausmer sent Mr. Desmery a proposal in which Mr. Li agreed to, among other things, (i) send an immediate wire amounting to the sum of the remaining balance on the Vase as well as the payments Skinner considered to be "questionable,"[14] (ii) pay Skinner's "reasonable legal fees" for an interpleader action related to the "questionable" payments, and (iii) indemnify Skinner for any liability it may incur with respect to those payments. (#99-1 at Ex. 76.) At 6:22 a.m. Monday morning, July 13, Mr. Zausmer followed up on his email noting that he "would appreciate the professional courtesy of a response to the e-mail I sent you yesterday." *Id.* Mr. Desmery responded later that day with concerns and questions regarding Mr. Zausmer's proposal, including that any indemnity provisions would be difficult to enforce on a Chinese national living outside the U.S., and made no commitments regarding the proposal. (#87 ¶ 93; #107 ¶ 93; #99-1 at Ex. 77.) Mr. Zausmer responded with a counter-proposal in which his client would, among other things, take full responsibility for the interpleader action related to the "questionable" payments. (#99-1 at Ex. 81.) His email further emphasized that "time is becoming of the essence" and that his client advised him that "he must take physical possession of the Vase from Skinner by no later than this Friday,

---

[14] The court refers to these payments as "the questionable payments," with the understanding that these are the payments that Skinner considered to be questionable. (#87 ¶ 92; #107 ¶ 92; #99-1 at Ex. 76 (Mr. Zausmer referring to the "portion of the unpaid balance which Skinner regards as questionable (hereafter, the 'Questionable Payments').") Whether the payments were in fact "questionable" remains in dispute. *Id.*

July 17." *Id.* He indicated that, "if we don't have an agreement worked out very soon, I foresee litigation coming down the pike." *Id.*

The next day, July 14, Mr. Desmery formally canceled the sale on Skinner's behalf. (#87 ¶ 94; #107 ¶ 94; #99-1 at Ex. 78.) In his email, he laid out the facts of the suspicious payments, the strange timing of the wires and the "flurry" of small payments, and concluded that, "[b]ased on the foregoing, as well as the unpaid balance of Skinner's invoice, Skinner has decided to exercise its right to cancel the sale of the Vase to Mr. Li." (#87 ¶ 95; #107 (undisputed); #99-1 at Ex. 78.) With respect to the $1.4 million Skinner had received to date, Mr. Desmery explained that Skinner intended to file an interpleader action, naming Mr. Fang and the "John Doe's" that supposedly sent money on Mr. Li's behalf and "let[ting] a judge decide if, when, and how much to return to Mr. Li." (#99-1 at Ex. 78.) Mr. Zausmer sent yet another counter-proposal in an attempt to save the sale, noting that his client had sent an additional wire payment of $350,000 over the weekend. (#87 ¶ 96; #107 ¶ 96; #99-1 at Ex. 79.) Skinner never received that $350,000 payment. (#87 ¶ 96; #107 ¶ 96.) He also offered numerous times to provide Skinner with the names and identities of the people who had made the small payments into Skinner's account (#87 ¶ 97; #107 ¶ 97), but never did so. (#87 ¶ 98; #107 ¶ 98 (disputing Skinner's characterization but conceding that defendants "did not know those individuals' identities").)

### H.  The Second Auction of the Vase.

Skinner ultimately included the Vase in a second auction on October 9, 2020, in which Skinner agreed to indemnify the purchaser from any claim to title from defendants. (#87 ¶¶ 99-100; #107 ¶ 99 (¶ 100 undisputed).) The Vase sold for a winning bid of $1,050,000—$280,000 less than the hammer price in June. (#87 ¶ 101; #107 (undisputed).) The lower hammer price resulted in a buyer's premium that was $56,000 less than that expected from the June sale, and, because Skinner had agreed to a commission charge 6% less than the one in June, Skinner lost

$96,600 in commission fees on the second sale.  (#87 ¶¶ 101-03; #107 ¶ 103 (¶¶ 101-02 undisputed).)  The buyer paid in full for the Vase by November 12, 2020, via five bank wires. (#104 ¶ 58 (plaintiff's additional facts); #114 ¶ 58; #100-1 at Ex. 89.)  Skinner settled with the Vase's consignor the same day, and, on November 24, 2020, confirmed shipment of the Vase to the buyer.  (#87 ¶ 105; #107 (undisputed); #100-1 at Exs. 90-91.)

### I.  The Interpleader Action and this Lawsuit.

Skinner continues to hold the funds paid by defendants or by third parties allegedly on their behalf—a total of $1,483,161.[15]  (#87 ¶ 106; #107 ¶ 106 (claiming total paid $1,429,399).)  On July 24, 2020, Skinner filed an interpleader action naming Mr. Li, Mr. Kumar, Ms. Luthra, and "John Does 1 through 50, representing the unknown individuals or entities that provided suspicious funds to, for or on behalf of Li."  (#1 at 1 (interpleader complaint).)  Along with the interpleader count, Skinner's complaint included a claim for breach of contract against Mr. Li.  *Id.* at 8-9.  In conjunction with its complaint, Skinner moved to deposit $928,172.66 of the disputed $1.4 million and sought authorization to retain $558,095 as compensation for its lost commission and fees and anticipated attorneys' fees and costs.  (#3.)  In response, Mr. Li filed counterclaims against Skinner, claiming breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of M.G.L. c. 93A (#14), which Skinner moved to dismiss (#19).  Mr. Li also moved to require Skinner to deposit with the court $1,720,440, which he claimed to have paid to Skinner as part of the sale of the Vase.  (#24.)  Skinner opposed this, too.  (#25.)

---

[15] The parties dispute whether Skinner holds the funds in a segregated account or an escrow account.  Defendants assert that no escrow account exists.  (#107 ¶ 106; #89 at App. 1066.) Plaintiff does not seem to disagree and claims instead that the funds remain in a segregated Bank of America account.  (#87 ¶ 106; #100-1 at Exs. 92-94.)  In any event, it is undisputed that Skinner continues to hold the funds and has neither returned them to defendants nor absconded with them outright.

Ultimately, Skinner was unable to ascertain the identities of the remaining individuals who sent payments to Skinner in the form of cashier's checks or money orders (other than Ms. Luthra and Mr. Kumar, who had already been reimbursed), and Mr. Li did not provide any of the information necessary to serve them, so on February 11, 2021, Skinner moved to amend its complaint to drop the interpleader, drop Ms. Luthra and Mr. Kumar as defendants, add Mr. Fang as a defendant, and assert direct claims against him and Mr. Li. (#26 at 1, ¶¶ 9, 19.) The court allowed the motion[16] (#34), and plaintiff filed its amended complaint (#35) asserting against Mr. Li and Mr. Fang identical claims for breach of contract (Counts I & II), breach of the implied covenant of good faith and fair dealing (Counts III & IV), violation of M.G.L. c. 93A § 11 (Counts V & VI), fraudulent misrepresentation (Counts VII & VIII), and declaratory judgment (Count IX). Defendants filed their counterclaims (#35), which Skinner again opposed (#44). Defendants did not move to dismiss any of Skinner's claims. In its order on Skinner's motion, the court limited the scope of defendants' counterclaims. (#67.)

### J.  The Motions to Strike (## 101, 109).

The parties then moved into discovery. On March 31, 2022, Skinner deposed Mr. Fang with the assistance of an interpreter. (#101 at 1; #110 at 2.) The final transcript of Mr. Fang's deposition was transmitted in English to plaintiffs, and one assumes to defendants as well, on April 13, 2022. *Id.* The parties did not stipulate to an agreed-upon deadline for errata, so the 30-day deadline set forth in Fed. R. Civ. P. 30(e)(1) ruled and ran on May 13, 2022. (#101 at 1-2.) Defendants never requested additional time to serve their errata. *Id.* at 2.

The parties filed cross-motions for summary judgment on July 15, 2022. (#85; #88.) Also on July 15, defendants served an errata sheet for Mr. Fang's deposition, signed that day and

---

[16] The court also denied as moot plaintiff's motion to dismiss (#19) and denied defendants' motion for deposit of interpleader funds (#24).

claiming that there was an error in translation on page 57, line 13 (among other minor changes). (#101 at 2; #110 at 2; #89 at App. 883-84 (errata sheet).)  In context, the change had a substantive effect on Mr. Fang's testimony:

> *Original:*
>
> Q.  What evidence do you have, if any, that Skinner engaged in negligent or faulty accounting practices?
>
>    […]
>
> A.  But in terms of negligence, I think there was some negligence.
>
> Q.  And what is your evidence of that negligence?
>
> A.   I think under normal circumstances . . . Skinner had sent me an invoice that excluded the sales tax, if Skinner had confirmed with me how much they had received and how much the remaining payment that they had not received in time, specifically if Skinner had send me the invoice that didn't show taxes **in time, I might have been** able to pay the amount off without any help from Mr. Liu.

(#89 at App. 877-78 (emphasis added)).

> *With errata change to final sentence:*
>
> Q.  And what is your evidence of that negligence?
>
> A.   I think under normal circumstances . . . Skinner had sent me an invoice that excluded the sales tax, if Skinner had confirmed with me how much they had received and how much the remaining payment that they had not received in time, specifically if Skinner had send me the invoice that didn't show taxes **at the beginning, I would have been** able to pay the amount off without any help from Mr. Liu.

*Id.* (applying changes reflected in errata sheet).  Defendants relied on the change in their statement of material facts, *e.g.*, #88-2 ¶ 58, and their summary judgment memorandum, *e.g.*, #88-1 at 9.

After attempting to confer with defense counsel four times over four days (three times by email and once via voicemail), plaintiff moved to strike the errata sheet on the morning of the summary judgment opposition deadline.  (#101.)  The motion included a Rule 7.1 certification,

18

setting out plaintiff's attempts, and ultimate failure, to confer prior to filing the motion. *Id.* Two days later, defendants filed a motion to strike plaintiff's motion to strike (#109), claiming plaintiff failed to comply with Rule 7.1 and that, if it had, the parties would have been able to re-review the video deposition and agree to a translation without the court's intervention. Defendants' motion did not include a Rule 7.1 certification. *Id.* Both motions are opposed. (#110; #112).

The court heard argument on all four motions on January 5, 2023. (#118.)

## III.   <u>The Summary Judgment Motions.</u>

### A.  Legal Standard.

"Summary judgment is appropriate when the moving party 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Drew Co., Inc. v. Wolf*, 511 F. Supp. 3d 15, 17 (D. Mass. 2021) (quoting Fed. R. Civ. P. 56(a)). "Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law.'" *Cherkaoui v. City of Quincy*, 877 F.3d 14, 23 (1st Cir. 2017) (quoting *Sánchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)). "And, '[a] dispute is 'genuine' if 'the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.'" *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 87 (1st Cir. 2018) (quoting *Cherkaoui*, 877 F.3d at 23-24) (alteration in original). "A court must view all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor." *Winfield v. Lawrence Gen. Hosp.*, No. 1:16-cv-11482, 2018 WL 4854628, at *1 (D. Mass. Oct. 5, 2018) (citing *Griggs-Ryan v. Smith*, 904 3.2d 112, 115 (1st Cir. 1990)). But, "a court must 'disregard conclusory allegations, improbable inferences, and unsupported speculation in determining whether a genuine factual dispute exists.'" *Id.* (quoting *Cherkaoui*, 877 F.3d at 23).

"'When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule

56.'" *Winters v. Ocean Spray Cranberries, Inc.*, 296 F. Supp. 3d 311, 316 (D. Mass. 2017) (quoting *Ferguson v. Gen. Star Indem. Co*, 582 F. Supp. 2d 91, 98 (D. Mass. 2008)). "'Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed.'" *Drew Co., Inc.*, 511 F. Supp. 3d at 18-19 (quoting *Ferguson*, 582 F. Supp. 2d at 98) (alteration omitted).

"Massachusetts law determines the elements of the parties' claims because the case is properly before this [c]ourt based on diversity jurisdiction," *Wagner v. Fed. Home Loan Mortgage Corp.*, 494 F. Supp. 3d 80, 85 (D. Mass. 2020); (#35 ¶ 4), and the COS expressly provide that they "shall be governed by the laws of the Commonwealth of Massachusetts," (#91-1 at Ex. 12 ¶ 13).

### B.  Plaintiff's Motion for Summary Judgment (#85).

Plaintiff moves for summary judgment on all nine counts in its Amended Complaint (#35) and on all three of defendants' counterclaims (#40 (as limited by #67)).  On plaintiff's motion, the court reviews all the facts in a light most favorable to defendants and makes all reasonable inferences in their favor.  *Winfield*, 2018 WL 4854628, at *1.

### i.   *Skinner's breach of contract claims – Counts I & II*

 "'Under Massachusetts law, the elements of a breach of contract claim are that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result.'" *Durbeck v. Suffolk Univ.*, 547 F. Supp.

3d 133, 144-45 (D. Mass. 2021) (quoting *Squeri v. Mount Ida Coll.*, 954 F.3d 56, 71 (1st Cir. 2020)).  The existence of a valid contract—here, the COS—is not in dispute.[17]

### a. Parties' positions.

Skinner argues that it was ready, willing, and able to perform under the COS and claims that defendants have not produced any evidence that Skinner did not have possession of the Vase and/or would not have delivered the Vase upon receipt of full payment.  (#86 at 11.)  It claims that (i) Skinner's messages to Mr. Li informing him that the Vase would be released only upon payment in full, and (ii) the delivery of the Vase to another buyer who did pay in full, prove this element of its claim.  *Id.*  As to breach, Skinner argues that there is no dispute that defendants did not pay for the Vase on the day of the sale, breaching Section 4 of the COS, and that Skinner never received full payment—even less sales tax—breaching Section 6.  *Id.* at 11-12.  Skinner does not base its breach of contract claim on the legitimacy of the "questionable" payments from defendants.

Defendants' relevant defenses[18] fall into four categories:  impossibility, waiver, modification, and unclean hands.  Defendants claim, first, that it was impossible for them to comply with Section 4 of the COS, which required full payment on the date of sale, because Skinner did not send an invoice until the next day.  (#106 at 9.)  Second, Skinner's June 24 request for payment constituted waiver of Section 4.  *Id.*  Third, Skinner's acceptance of defendants' late payments constituted a modification of the COS that allowed defendants an as-yet-undefined additional amount of time to pay.  *Id.* at 11.  Finally, Skinner's failure to confirm whether it

---

[17] Although the parties quibble over whether Mr. Li agreed to the COS before bidding on the Vase, *e.g.* #107 ¶¶ 3, 5, the parties agree, *id.*, and the court has ruled, (#67 at 6, 9), that the COS governed the parties' relationship.

[18] Defendants' opposition responds to many arguments that Skinner did not make in its opening motion, so the court will focus only on those arguments that address live issues.

received the final wires hindered defendants' performance, such that Skinner cannot now claim breach. *Id.* at 11-12.

### b. *Discussion.*

There is no dispute that defendants did not pay for the Vase on the day of the auction, nor any dispute that Section 4 required them to do so.[19]  (#87 ¶ 32; #107 (undisputed).)  There is also no dispute that defendants never paid for the Vase in full, even less sales tax.  *E.g.* #106 at 6 (conceding "[i]n total, Skinner received $1,429,399.00 from the defendants toward a $1,608,500 obligation"); #107 ¶ 45 (calculating total payment as $1,429,399 "toward a $1,608,500 obligation").  There is, however, a dispute as to whether plaintiff waived its rights under or otherwise modified the COS by (i) requesting payment days after the sale and (ii) accepting defendants' late and partial payments. *Bachorz v. Miller-Forslund*, 703 F.3d 27, 32 (1st Cir. 2012) ("Whether a party has waived a right under a contract is usually a question of fact, but the issue may be resolved on summary judgment when 'the evidence is clear, unequivocal and undisputed.'" (quoting *Metro Transit Auth. v. Ry. Exp. Agency, Inc.*, 84 N.E.2d 26, 28 (Mass. 1949)).

---

[19] Defendants argue that Skinner sent the invoice on June 19 rather than June 18, therefore making it impossible for defendants to pay on the day of the auction in accordance with Section 4. (#106 at 9.)  Defendants' argument relies on a version of Skinner's invoice email with a BST timestamp that indicates Mr. Li received the email at 2:04 BST on June 19, 2020. (#89 at App. 591.)  The document appears not to have been produced in discovery, as it bears no bates stamp. *Id.*  In the memorandum of law in support of their own motion, defendants state that "BST refers to British Summer time, which is Greenwich Mean Time +1," or six hours ahead of Eastern Standard Time. (#88-1 at 6 n. 4.)  Defendants produced another version of the same email with a timestamp of 10:05 pm on June 18, 2020, or four hours ahead of the BST timestamp. (#92-1 at Ex. 28 (bates stamped Li_0000042).)  That version did not indicate a time zone. *Id.*  Both documents ostensibly originated with defendants, so this is not a question of whose evidence to believe. *See* #111 at 5-6.  Luckily, the court need not parse these apparent discrepancies—even if Skinner did send the invoice on June 19, there is no evidence that defendants paid or attempted to pay Skinner the total amount on that date, either.

The court has already ruled that the COS's terms are unambiguous and therefore extrinsic evidence may be used to interpret, but not contradict, its terms. (#67 at 9.) Interpretation of those terms is a question of law that is proper for summary judgment. *Faiola v. APCA Graphics, Inc.*, 2010 WL 11579960, at *8 (D. Mass. Jan. 12, 2010) ("'If a contract . . . is unambiguous, its interpretation is a question of law that is appropriate for a judge to decide on summary judgment.'" (quoting *Seaco In. Co. v. Barbosa*, 761 N.E.2d 946, 951 (Mass. 2002))). Plaintiff argues that the terms of the contract grant it the option to terminate the agreement at any time if a buyer fails to pay for an item on the day of the auction. (#111 at 4.) The court has already ruled, however, that the COS alone does not foreclose the possibility of implicit waiver or modification. (#67 at 12.)

In fact, the court found that Skinner's revised invoice reflecting its application of defendants' late payments could show that "Skinner accepted the delayed payments and intended to allow defendants to submit additional payment(s) to complete their purchase." *Id.* Skinner's emails support this inference, indicating that plaintiff may have continued to accept payment until defendants paid in full, at which time there is little argument that they would no longer have been in breach. *E.g.*, #99-1 at Ex. 53 (e-mail from Skinner to Mr. Li dated June 30, 2020, applying payments to date: "You should have received an email with your invoice attached . . . You will receive an email confirmation once your invoice has been paid in full. If you have any questions about remitting payment or looking for confirmation please feel free to email us here, or call"); Ex. 54 (updated invoice crediting post-June 18 payments to Mr. Li's account).

Skinner has not produced additional evidence at summary judgment barring the possibility that it modified the terms of the agreement, other than Mr. Li's deposition testimony admitting that Skinner never agreed to a payment plan, (#111 at 8; # 87 ¶ 49; #107 ¶ 49), which was already supported by documentary evidence that this court credited under Rule 12(b)(6) (#67 at 11-12).

The uncontroverted evidence that defendants never paid for the Vase in full does not foreclose the possibility that Skinner had modified the terms of the COS to allow them additional time to pay. *Cf. id.* (noting that in deciding plaintiff's motion to dismiss, the court must take as true defendants' allegation that they did pay in full). Viewing the facts in defendants' favor, a reasonable jury could find on this record that Skinner modified the terms of the contract by accepting late payments and/or waived its right to terminate the sale without warning for failure to pay on the day of the auction. Skinner's motion is denied as to Counts I and II of its amended complaint (#35).

### ii. *Skinner's breach of the implied covenant of good faith and fair dealing claims – Counts III & IV*

"[I]n Massachusetts, every contract is subject to an implied covenant of good faith and fair dealing." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806, 821 (Mass. 1991). "The implied covenant of good faith and fair dealing provides 'that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]'" *Id.* at 820 (quoting *Drucker v. Roland Wm. Jutras Assocs.*, 348 N.E.2d 763, 765 (Mass. 1976)). That said, "[t]he purpose of the covenant of good faith and fair dealing is not to supply contractual terms that the parties are free to negotiate." *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 805 N.E.2d 957, 966 (Mass. 2004); *see Ayash v. Dana-Farber Cancer Inst.*, 822 N.E.2d 667, 685 (Mass. 2005) ("This implied covenant may not be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, but rather concerns the manner of performance." (internal quotes and citations omitted)).

Recovery under a theory of breach of the implied covenant of good faith and fair dealing "'requires conduct taken in bad faith either to deprive a party of the fruits of labor already substantially earned or unfair leveraging of the contract terms to secure undue economic advantage.'" *Gallagher v. J.P. Morgan Chase Bank, N.A.*, No. 21-cv-11411, 2022 U.S. Dist. WL

1538923, at *9 (D. Mass. May 16, 2022) (*Christiansen v. Kingston Sch. Comm.*, 360 F. Supp. 2d

212, 226 (D. Mass. 2005)). Such harms "generally involve deceit or 'unfair subterfuge' and usually

are 'compounded by deceptive or unfair behavior that prevented—or at a minimum diverted—the

injured parties from seeking immediate redress.'" *Christiansen*, 360 F. Supp. 2d at 226 (quoting

*Boston Pilots v. Motor Vessel Midnight Gambler & E. Coast Excursions, Inc.*, 357 F.3d 129, 135

(1st Cir. 2004)).

### a.   Parties' positions.

Skinner's implied covenant claim is based on the theory that defendants (i) made false

promises to tender full payment; (ii) sent Skinner inaccurate bank wire receipts; (iii) sourced illicit

funds for payment; (iv) scheduled a shipper to hurriedly pick up the Vase for overseas shipment

before paying in full; and (v) sent threatening demands to Skinner, all in an effort to abscond with

the Vase without paying for it in full.[20] (#86 at 14-15.)

Defendants argue that Skinner failed to present any evidence that (i) defendants knew that

they did not intend to tender full payment when they bid on the Vase; and (ii) the "questionable"

payments were suspicious, illicit, or fraudulent.   They claim Skinner's use of the terms

"suspicious" and "fraudulent" is unsupported and should be rejected as "vitriolic hyperbole," and

---

[20] Defendants correctly point out that plaintiff based its implied covenant claims on the "suspicious funds" issue only and not the "absconding" theory.  (#35 at ¶¶ 48-55.)  Nonetheless, the court sees no issue in allowing plaintiff to move forward on both theories because plaintiff alleged the "absconding" theory in its chapter 93A claims, *id.* at ¶¶ 59, 65, so defendants had adequate notice and opportunity to explore it in discovery.  *Avalanche IP, LLC v. FAM, LLC*, No. 20-cv-10102, 2022 WL 3597411, at *5 (D. Mass. Aug. 23, 2022) ("While the Court agrees with [counterclaim defendant] that summary judgment is not an opportunity to raise new claims or theories of liability . . . the Court will consider the alternative theory . . . because it is based on the same facts that underlie [counterclaim plaintiff's] original counterclaim . . . . [T]here are no facts tied to this theory . . . that were not explored in discovery and that [counterclaim defendant] has not been long aware of.")

that plaintiff's reliance on counsel's and Bank of America's advice as to defendant's potential fraud is based on impermissible hearsay.  (#106 at 7, 12-13.)  Finally, defendants argue again that the court cannot consider any actions taken after the contract ended on July 10 because the covenant applies only to the performance of a contract; therefore, they say, Skinner cannot rely on Mr. Li's efforts to have the vase shipped or the allegedly threatening demands by counsel to support its claims.  *Id.* at 16-17.

### b. *Discussion.*

Skinner's implied covenant claims survive summary judgment.  The record supports (but does not prove) Skinner's theory that defendants were either fraudulently causing individuals to deposit money into Skinner's account and/or attempting to abscond with the Vase without paying for it in full, either of which could support a claim for breach of the implied covenant.  Much of this evidence is undisputed.[21]  For example:

- Defendants sent wire transfer receipts for amounts that Skinner never received.  (#87 ¶ 67; #107 ¶ 67 (disputing that Skinner did not receive $7,000 transfer, but not disputing that Skinner did not receive $295,049 wire for which Mr. Li sent a transfer receipt).)

- Defendants caused around 160 small individual deposits to enter Skinner's bank account and the defendants cannot say from where they originated.  (#107 ¶ 98 ("This assertion [that counsel for defendants' never provided the identities of these various payors] assumes that the Defendants knew the identities of the various payors.  The defendants did not know these individuals' identities.").)

---

[21] Defendants are correct that the evidence submitted by Skinner supporting Bank of America's or counsel's opinions as to the legitimacy of defendants' payments and/or any indicia of fraud is hearsay that cannot be considered for the truth of the matter asserted on summary judgment. *Kenney v. Floyd*, 700 F.3d 604, 609 (1st Cir. 2012).  *See, e.g.*, (#87 ¶ 87 ("Skinner's Bank of America representative communicated to Skinner's CEO Karen Keane on July 8, 2020 that he recommended 'cancel[ing] this sale because of the curious way [Skinner] has been paid,' stating further that 'it could be that they are scamming unwitting people out of money or they are laundering their money from some other scheme. Either way this is a bad deal… [Pajka] also pointed to their pressure as a tactic that doesn't look right.'" (citing only Ex. 72 (SKINNER0006680)); #99-1 at Ex. 72 (email from Ms. Keane to Skinner counsel Martin Desmery, memorializing telephone call with John Pajka from Bank of America).)

- Skinner received a call from Ms. Luthra claiming that she had been the victim of telephone fraud and that, as a result, she had deposited $2,934 into Skinner's account. The transfer was found to have been "unauthorized" and the funds were withdrawn from Skinner's account and returned to Ms. Luthra and her husband. (#87 ¶¶ 81-86; #107 ¶¶ 81-86 (only contesting that "the communication record makes no reference to sending Skinner a cashier's check 'including her husbands [sic] name'").) Ms. Luthra was defrauded on or around July 1, around the same period of time that 150 or so deposits of similar amounts entered Skinner's account and were credited to Mr. Li's account, i.e. June 26-30.  (#87 ¶ 56; #107 (undisputed); ##94-1 – 96-1 at Ex. 45.)

- Defendants secured a shipper and tried to ship the Vase without confirmation of full payment from Skinner.  (#87 ¶ 90; #107 (undisputed); #87 ¶ 80; #107 (undisputed).)

- Defendants' counsel sent Skinner's counsel a message that if the Vase was not transferred it "would be a problem for you and me."  (#87 ¶ 91; #107 ¶ 91 (disputing the characterization of counsel's message, but not its substance).)

Defendants dispute that this evidence proves that they were acting in bad faith. The evidence does not prove plaintiff's claim as a matter of law, but it creates a dispute of material fact as to defendants' intent. *Penate v. Kaczmarek*, No. 3:17-cv-30119, 2022 WL 407411, at *6 (D. Mass. Feb. 10, 2022) ("Additionally, this court takes into consideration the principle . . . that 'intent is a matter generally deemed ill-suited to summary judgment—as the First Circuit has cautioned, courts must be exceptionally cautious in granting *brevis* disposition in such cases.'" (quoting *Chu v. Legion of Christ.*, 2 F. Supp. 3d 160, 176 (D.R.I. 2014) (quoting *In re Varesso*, 37 F.3d 760, 764 (1st Cir. 1994) (internal quotation marks omitted))).   Giving defendants the benefit of every inference, a jury could find that they attempted in good faith to purchase the Vase. *See Zemrock v. Yankee Candle Co., Inc.*, No. 14-cv-30107, 2017 WL 506249, at *11 (D. Mass. Feb. 7, 2017) (denying summary judgment on retaliation claim because "[i]ssues involving questions of motive, intent, and state of mind . . . are not usually appropriate for the resolution at the summary judgment stage."  (citing *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000)).  Skinner's motion is denied as to Counts III and IV of its amended complaint (#35).

### iii.    *Skinner's violation of M.G.L. c. 93A § 11 claims – Counts V and VI*

"To be successful, a plaintiff bringing a claim under § 11 must establish (1) that the defendant engaged in an unfair method of competition or committed an unfair or deceptive act or practice, as defined by G.L. c. 93A § 2, or the regulations promulgated thereunder; (2) a loss of money or property suffered as a result; and (3) a causal connection between the loss suffered and the defendant's unfair or deceptive method, act, or practice." *Auto Flat Car Crushers, Inc. v. Hanover Ins. Co.*, 17 N.E.3d 1066, 1074-75 (Mass. 2014).

"'Whether conduct is unfair or deceptive under G.L. c. 93A is a mixed question of law and fact.'" *Vita v. Berman, DeValerio & Pease, LLP*, 967 N.E.2d 1142, 1149 (Mass. App. Ct. 2012) (quoting *Zabin v. Picciotto*, 896 N.E.2d 937, 963-64 (Mass. App. Ct. 2008), *rev. denied*, 453 Mass. 1103 (Mass. 2009)). It is a question of fact whether the alleged conduct was unfair or deceptive; but whether that conduct rose to the level of a Chapter 93A violation is a question of law. *H1 Lincoln, Inc. v. South Washington Street, LLC*, 179 N.E.3d 545, 556-57 (Mass. 2022). "'Conduct in disregard of knowing contractual arrangements and intended to secure benefits for the breaching party'" may constitute an unfair act or practice under Chapter 93A. *Vita*, 967 N.E.2d at 1149 (quoting *Anthony's Pier Four*, 583 N.E.2d at 821)). But, as the Massachusetts Appeals Court has noted,

> [a] breach of contract, standing alone, is not an unfair trade practice under c. 93A. Instead, to rise to the level of a c. 93A violation, a breach must be both knowing and intended to secure "unbargained-for benefits" to the detriment of the other party. The breaching party's conduct must exceed the level of mere self-interest, rising instead to the level of "commercial extortion" or a similar degree of culpable conduct.

*Zabin*, 896 N.E.2d at 963 (internal quotation marks and citations omitted). "Specifically, a party's refusal to make payments due under a contract does not constitute an unfair trade practice where

the party, in good faith, disputes its obligation to make the payments." *Id.* (citing *Levings v. Forbes & Wallace, Inc.*, 396 N.E.2d 149, 153-54 (Mass. 1979)) (collecting cases).

### a. Parties' positions.

Skinner's Chapter 93A claims are based on largely the same conduct as its breach of the implied covenant claims, discussed *supra*. (#86 at 18-22.) In addition, it claims defendants knew that they could not pay for the Vase at the time of bidding, hired Mr. Liu as a payment agent to find the funds, and then made no effort to ensure the funds were legitimate. *Id.* at 20. Skinner further argues that defendants knowingly breached the COS by failing to tender payment on the day of the auction; used deceptive tactics to deter Skinner from exercising its termination rights by sending false wire receipts, making false promises to pay, and sending illicit funds by way of individual wires; and then pressured Skinner to transport the Vase before full payment was made or Skinner could investigate the origin of the funds. *Id.* at 18-22. Because it alleges defendants' deceptive acts were knowing and willful, plaintiff claims that it is entitled to statutory treble damages. *Id.* at 23-24.

Defendants' position on Skinner's Chapter 93A claims is nearly identical to its arguments on Skinner's breach of the implied covenant claims, discussed *supra*. (#106 at 17-19.) Defendants argue that the record cannot support a finding that the funds defendants transmitted were illegitimate or tainted, that defendants knowingly misrepresented their ability to pay, or that they otherwise failed to act in good faith. *Id.* Even if Skinner could prove its allegations, defendants argue, they do not rise to the level of a Chapter 93A violation. *Id.* at 18-19.

### b. Discussion.

Once again, Skinner has presented enough evidence to create a dispute of material fact as to defendants' bad faith, but cannot prove it as a matter of law. *See Tomasella v. Nestlé USA, Inc.*,

962 F.3d 60, 71 (1st Cir. 2020) ("Of additional note, 'Chapter 93A liability is decided case-by-case, and Massachusetts courts have consistently emphasized the 'fact-specific nature of the inquiry.'" (quoting *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 55 (1st Cir. 1998))).  The evidence before the court could support a finding that defendants paid for the Vase with illicit funds or that they intended to make off with the Vase without paying fully, either of which would support a Chapter 93A claim.  *Id.* at 70, 79 (noting that "[a]n act or practice is unfair [under Chapter 93A] if it is (1) within the penumbra of a common-law statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantive injury to . . . business people," and that conduct is "deceptive" if "it possesses a tendency to deceive and it could reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted.")  Indeed, courts have found that similar, lesser, behavior violates Chapter 93A.  *See, e.g.*, *Renovator's Supply Inc. v. Sovereign Bank*, 892 N.E.2d 777, 786-88 (Mass. App. Ct. 2008), *rev. denied*, 896 N.E.2d 632 (Mass. 2008) (Table) (holding bank that "presented [plaintiff] with a 'take it or leave it' proposal" after it decided it "wanted new terms and now had the leverage to achieve" them violated Chapter 93A).  But for all the reasons discussed *supra* with regard to plaintiff's implied covenant claim, there remains a dispute of material fact as to whether the funds were illicit or whether the defendants were acting deceptively that bars summary judgment in Skinner's favor.  Skinner's motion is denied as to Counts V and VI of its amended complaint (#35).

### iv.    *Skinner's fraudulent misrepresentation claims – Counts VII – VIII*

"To prevail on a claim for fraudulent misrepresentation, the plaintiff 'must establish that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the

representation as true and acted upon it to his damage." *Nationwide Book Indus., LLC v. A&S Booksellers, Inc.*, 950 F. Supp. 2d 264, 267 (D. Mass. 2013) (quoting *Russell v. Cooley Dickinson Hosp., Inc.*, 772 N.E. 2d 1054, 1066 (Mass. 2002) (internal quotes and citations omitted)).

### a.  Parties' positions.

Skinner's fraudulent misrepresentation claims are based on the following allegedly false statements made by Mr. Li on Mr. Fang's behalf:  (1) full payment less sales tax would be made by June 29, 2020; (2) payment of a wire for $640,000, for which Mr. Li sent a receipt, would arrive by June 29, 2020; (3) an additional payment of $668,500 would arrive by June 29, 2020, to complete full payment for the Vase, less sales tax; (4) a payment of $111,940 had been paid "by mistake" and was an overpayment; and (5) an additional $350,000 had been transferred, in response to Skinner's intention to cancel the transaction.  (#86 at 25.)  Skinner argues that the statements were clearly false because none of the payments ever arrived (except the $111,940 payments that defendants claimed were made by mistake), and that the statements "were clearly made with the intention to stop Skinner from cancelling the sale, as each was made after Skinner warned that it would cancel the sale if full payment was not made."  *Id.*  Even if defendants did not intend to make false statements, plaintiff argues that their misstatements were at least reckless because defendants made them with no personal knowledge or diligent examination of the payments, as the payments were in fact made by Mr. Liu.  *Id.* at 26.  Skinner claims it relied on the statements to its detriment and waited to cancel the sale until it "no longer had any other choice," causing damages.  *Id.*

Defendants argue that there is no evidence (i) the statements were false, or (ii) Skinner relied on those statements to its detriment.  (#106 at 19-20.)  They also argue in their moving papers that Skinner cannot show that defendants knew the statements were false at the time they

were made, and that the statements upon which Skinner relies constituted unactionable promises of future intent.[22]  (#88-1 at 24-25.)

### b.  Discussion.

Skinner survives summary judgment on its fraudulent misrepresentation claims, but defendants' intent and plaintiff's detrimental reliance remain material issues of fact that keep plaintiff from winning at this stage.  *Nationwide Book Indus.*, 950 F. Supp. 2d at 270 ("The First Circuit has advised caution when disposing of the state of mind issue on summary judgment." (quoting *Bolen v. Paragon Plastics, Inc.*, 754 F. Supp. 221, 226 (D. Mass. 1990)).  It is largely undisputed that the statements Mr. Li made did not turn out to be true—that is, the payments that Mr. Li said were on the way never arrived.  Four of the five statements were not mere statements of intent, either; they were supported by images of receipts that indicated the transfers had already occurred.  In any event, although "a statement on which liability for misrepresentation may be based must be one of fact, not of expectation," *Zimmerman v. Kent*, 575 N.E.2d 70, 75 (Mass. App. Ct. 1991), if the speaker knows a statement of future intent is false (or impossible) at the time the statement is made, that statement is actionable if the injured party relies on it to their detriment. *Olafsson v. Sullivan-McCaughey*, 111 N.E.3d 305 (Mass. App. Ct. 2018) (Table) ("[F]alse statements of future intent are actionable as fraud if a jury can find 'the statements misrepresent

---

[22] Additionally, defendants argue that "Skinner appears to contend that the defendants should be deemed to have implied that they would not use suspicious funds and that payment would be legitimate" and that the parties "can debate whether such a representation can be implied (as the record is devoid of an express representation)[.]"  (#106 at 19.)  If defendants mean to argue that they cannot be held liable for false payments because they never expressly promised to pay Skinner with legitimate funds, the court rejects that argument; legitimate payment is clearly implied in any legal transaction.  At any rate, Skinner does not base its claims on any allegedly illicit payments, only on the promises that payments would arrive and then did not.  So, the argument is inapposite as well.

the actual intention of the speaker and were relied on by the recipient to his damage.'" (quoting *McEvoy Travel Bureau, Inc. v. Norton Co.*, 563 N.E.2d 188, 192 (Mass. 1990))).

Skinner has presented enough evidence to create a dispute as to whether defendants knew the statements were false when made, but it cannot prove defendants' knowledge as a matter of law.  Reviewing the facts in the light most favorable to defendants, a reasonable jury could find that defendants believed the payments were on the way and that something unforeseen, unknown, or out of their control prevented the money's arrival; that same jury could also find to the contrary.

Moreover, Skinner has not proven reasonable reliance.  It claims that it "has presented evidence that its reliance on Defendants' statements caused Skinner to postpone cancelation of the sale, necessitating a second auction when the sale was later canceled, rather than cancelling the sale earlier and selling the Vase to the underbidder (as Skinner had suggested on June 24, 2020)." (#111 at 15.)  The only evidence Skinner cites, however, is an email from Skinner to Mr. Li dated June 24, 2020, threatening to offer the Vase to the underbidder if Skinner did not receive payment by the end of the following day.  *Id.*; *see* #87 ¶ 41; #92-1 at Ex. 34.  This email, coupled with Mr. Li's subsequent promises of immediate payment, demonstrates that Skinner's sale to the underbidder may have faced time restrictions with which defendants interfered. It does not prove as a matter of law, however, that defendants' delay hindered Skinner's sale or that the delay forced Skinner to conduct a second auction rather than sell to the underbidder, as the COS contemplates. Skinner's motion is denied as to Counts VII and VIII of its amended complaint (#35).

### v.   *Skinner's declaratory judgment claim – Count IX*

Skinner seeks declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and Fed. R. Civ. P. 57 declaring its cancellation of the sale valid under the COS.  (#35 ¶¶ 80-85.)  "An action for declaratory judgment 'enable[s] litigants to clarify legal rights and

obligations before acting upon them.'" *Tocci Bldg. Corp. of New Jersey, Inc. v. Virginia Sur. Co.*, 750 F. Supp. 2d 316, 320 (D. Mass. 2010) (quoting *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 534 (1st Cir. 1995)) (alteration in original).  "District courts have significant discretion when deciding if declaratory judgment is appropriate." *Rishell v. Med. Card Sys., Inc.*, 925 F. Supp. 2d 211, 221 (D.P.R. 2013) (citing *DeNovellis v. Shalala*, 124 F.3d 298, 312-14 (1st Cir. 1997)).

Skinner concedes that its declaratory judgment claim rises and falls with its breach of contract claim.  (#86 at 11 (arguing breach of contract and declaratory judgment together).)  For the same reasons discussed above in relation to Skinner's breach of contract claims, Skinner's motion is denied as to Count IX.[23]

### vi.   *Defendants' breach of contract counterclaim – Counterclaim I*

#### c.  Parties' positions

Defendants claim Skinner breached the COS by (i) terminating the sale of the Vase without notice after agreeing to modify the payment deadlines outlined in Section 4; and (ii) not returning the $1,429,399 after terminating the sale, as contemplated in Section 6.  (#88-1 at 27-30; #106 at 20 (incorporating argument in opposition).)  The COS does not, they say, grant Skinner the right to hold the funds due to an ongoing fraud investigation.  *Id.*

Skinner argues defendants cannot prove breach because (i) the unambiguous terms of the contract allow it to terminate the contract at any time if payment is not made in full the day of the auction (which it undisputedly was not); (ii) there is no evidence of modification in the record, for

---

[23] Defendants do not address plaintiff's declaratory judgment argument in its opposition (#106), instead requesting declaratory judgment in its own favor in its own motion, (#88-1 at 25-26), which the court addresses *infra*.

instance, defendants offered no consideration in exchange for Skinner's modifying the COS to allow them more time to pay; and (iii) there is no evidence of waiver, especially considering Skinner's consistent communications that it would not accept partial payment or other payment plan options.  (#86 at 27-32.)  Skinner also claims that defendants were not ready, willing, and able to perform under the contract, because they did not have the funds accessible to pay for the Vase on the day of the auction.  *Id.*

The court already held that the terms of the COS and the undisputed facts in the record allow for the possibility of waiver and/or modification, so defendants' breach of contract counterclaim should survive on the same grounds.  *See supra*.  There is also a dispute of material fact as to whether defendants were ready, willing, and able to hold up their end of the bargain at the time of the auction.  Skinner's motion is denied as to Counterclaim I (#40). [24]

### vii.   *Defendants' breach of the implied covenant of good faith and fair dealing counterclaim – Counterclaim II*

Defendants' only theories remaining after the court's order on Skinner's motion to dismiss are: (i) Skinner agreed to modify its payment terms only to later change its mind without notice to defendants; (ii) Skinner failed to properly account for payments that Mr. Fang caused to be made; and (iii) Skinner improperly included sales tax on invoices to defendants and refused to provide advice or information on how to remove it.  (#67.)

_____

[24] The court notes that defendants' assertion that plaintiff wrongfully held defendants' funds is questionable.  The COS do not allow plaintiff to keep bidders' funds whose bids fall through. (#91-1 at Ex. 12, §§ 4, 6.)  Even two-and-one-half years later, however, defendants have produced no evidence indicating that they know the source of the funds or that they are the funds' rightful owners.  Skinner is holding the funds in a segregated Bank of America account (not an escrow account, as defendants loudly make clear) until the question of ownership is settled.  There is no evidence that plaintiff is "enjoying" defendants' funds throughout the course of litigation.  There is evidence that Skinner made a good faith effort to determine the sources of the funds via the interpleader action.  (#1.) Defendants did not, or were unable to, cooperate with that endeavor. (#26.)

First, defendants have not put forth any evidence that Skinner was attempting to extract a better deal from defendants through its conduct.  There is no evidence Skinner requested additional money from defendants in exchange for the Vase, nor that plaintiff was attempting to terminate the agreement to profit from a better deal—in fact, the opposite transpired.  *See A.L. Prime Energy Consultant, Inc. v. Massachusetts Bay Transport. Auth.*, 95 N.E.3d 547, 561 (Mass. 2018) (affirming motion to dismiss implied covenant claim because "this is not a case in which one party leveraged its discretion to 'recapture opportunities for forgone contracting' or 'to refuse to pay the expected costs of performance'. . . . [n]or has [plaintiff] claimed [that defendant] entered into the contractual relationship without intending to continue it for the full term" (quoting *Anthony's Pier Four, Inc.*, 583 N.E.2d at 821)).

Second, there is no evidence that Skinner failed to properly account for defendants' payments, and there are undisputed facts in the record demonstrating that only around $1.4 million made it to Skinner, just as Skinner's accounts reflect.[25]

Third, there is no evidence that Skinner attempted to force defendants to pay sales tax when none was required in a conscious effort to steal the erroneous fee.  Defendants did not provide Skinner with the necessary paperwork until July 7, 2020.  (#87 ¶ 79; #107 (undisputed, but sales tax position laid out in response to #87 ¶ 78).)  As Ms. Keane testified, Skinner could not have simply accepted defendants' word that they were shipping the item overseas; Skinner required proper documentation that complied with the law.  (#89 at App. 210 ("We . . . expect our clients to be able to prove to us that they do not need to be charged  sales tax in the various states where we collect sales tax or they don't need to be – because they are either a dealer or a museum or that they are shipping the things out of . . . the country, and . . . this is not Skinner's rules.  These are

---

[25] Indeed, defendants seem to no longer pursue argument (ii).  (#88-1 at 31-32.)

the tax rules for the State of Massachusetts and the State of New York and the State of Florida and the State of Maine."). After Mr. Li provided the proper documentation, Skinner's counsel, Martin Desmery, did provide an invoice including sales tax; but by then, Skinner and/or its counsel and bank had already begun an investigation into defendants' payments, and Mr. Desmery's communications with Mr. Li's counsel do not indicate he was attempting to fraudulently collect the exempted sales tax.

Moreover, despite defendants' claim that the erroneously added sales tax complicated their international payments, there is no evidence that defendants ever planned to pay the sales tax. All of Mr. Li's communications with Skinner indicate that he intended to pay the invoice without sales tax. For instance, on June 25, 2020, Mr. Li sent an email to Judith Dowling at Skinner stating, "We already sent 300,000 USD from UK bank . . . Please find attachment as the transfer receipt for another $640,000 USD . . . The rest of the amount $668,500 would be transferred on next Monday." (#89 at App. 476.) Those three wires add up to $1,608,500, the invoice amount minus the sales tax, indicating that, whether Skinner included the sales tax on the invoice or not, defendants never intended to pay it and did not include it in their internal calculations. *See also* #91-1 at Ex. 25, Li_0000227 (June 19, 2020 text from Mr. Li to Mr. Fang explaining that "[t]he sales tax of one hundred thousand dollars can be taken off" and "[t]he bill is sent by the computer automatically . . . [s]o it is not changed."). Moreover, when defendants' counsel attempted to coordinate shipping because Mr. Li allegedly believed the full invoice had been paid, he also attempted to collect an alleged overpayment—i.e. the amount over and above the invoice without sales tax. (#87 ¶ 90 ("After that [July 7, 2020], Skinner was contacted by Mr. Li's counsel . . . stating that Mr. Li had paid $1,720,440, asserting that this was an overpayment of $111,940 and

wanted to ensure his client could arrange to pick up the Vase on July 10, 2020."); (#107 (undisputed).)

Although the facts must be read in the light most favorable to defendants and all inferences taken in their favor, the court must "'disregard conclusory allegations, improbable inferences, and unsupported speculation in determining whether a genuine factual dispute exists.'" *Winfield*, 2018 WL 4854628, at *1 (D. Mass. Oct. 5, 2018) (quoting *Cherkaoui*, 877 F.3d at 23). Defendants have produced no evidence of bad faith or gamesmanship on Skinner's part. *A.L. Prime Energy Consultant*, 95 N.E.3d at 561. Skinner's motion is granted as to Counterclaim II, and Counterclaim II is dismissed with prejudice.

### viii.   *Defendants' violation of M.G.L. c. 93A § 11 counterclaim – Counterclaim III*

Defendants' only Chapter 93A theories remaining after the court's motion to dismiss order are: (1) Skinner improperly charged defendants sales tax from which they should have been exempt; (2) Skinner engaged in faulty accounting practices;[26] and (3) Skinner deemed defendants' payments to be suspicious without any evidence. (#67 at 18.) Defendants' theories dovetail with their implied covenant counterclaim (the sales tax theory) and their opposition to Skinner's implied covenant claim (suspicious payments theory), both discussed *supra*. Defendants also argue for the first time that "Skinner canceled the sale of the vase for an improper and insufficient reason and subsequently exercised control over the defendant's money, essentially holding it hostage unless the defendants agree to pay Skinner's legal fees, even though Skinner had no right to those fees,

---

[26] Defendants seem to no longer pursue (2) (#88-1 at 32), and plaintiff does not address it in its motion (#86 at 34-35). For the same reasons discussed above in relation to defendants' implied covenant counterclaim, the theory would fail on the summary judgment record presently before the court.

contractual or otherwise." (#88-1 at 32.)   This argument mirrors its breach of contract and implied covenant theories.

Even taking all inferences in defendants' favor, there is insufficient evidence in the record to establish that Skinner behaved deceitfully or with bad faith to support a finding that plaintiff violated Chapter 93A.   Contrary to defendants' assertion, there is evidence supporting Skinner's belief that defendants' payments may have been fraudulent.   *See supra* at 26-27.   And, for the same reasons discussed above, there is no evidence that Skinner charged defendants sales tax dishonestly—indeed there is evidence that defendants never intended to pay it.   Even if Skinner had been delinquent in sending defendants information regarding the sales tax waiver, such a delay would not rise to the level of a Chapter 93A violation.   *Baker v. Goldman, Sachs & Co.*, 771 F.3d 37, 49 (1st Cir. 2014) ("Whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, but whether that conduct rises to the level of a chapter 93A violation is a question of law." (internal cites and quotes omitted)).

Addressing defendants' new theory in the most favorable light, there is no evidence in the record to support a finding that Skinner held defendants' funds "hostage" following the termination of the agreement.   Skinner did not know, and does not know, whether the funds belong to defendants, and defendants have produced no evidence to establish their entitlement to the funds.   *Zabin*, 896 N.E.2d at 963.   Skinner's motion is granted as to Counterclaim III.   Counterclaim III is dismissed with prejudice.

### C.   Defendants' Motion for Summary Judgment (#88).

Defendants move for summary judgment on all nine of plaintiff's claims (#35) and on all three of their own counterclaims (##40, 67).   As a preliminary matter, defendants' motion as to Counterclaims II and III is denied as moot in light of the court's order on Skinner's motion, *supra*.

### i.    *Skinner's breach of contract claims – Counts I & II*

#### a.   *Parties' positions.*

In their own motion, but not in opposition to Skinner's, defendants claim that Skinner was not "ready, willing, and able to perform" its end of the bargain because it violated the covenant of good faith and fair dealing by avoiding defendants, failing to provide them with an invoice without sales tax, and failing to confirm whether it received defendants' wires.   (#88-1 at 18-19.) Defendants claim Skinner's conduct interfered with their rights to enjoy the fruits of their contract such that plaintiff cannot now claim breach.  *Id.*  Defendants also argue, without any legal support, that Skinner is estopped from claiming breach because Skinner "never rescinded" its permission for defendants to pay past the window allowed in the COS.[27]  *Id.* at 19-20.

Skinner counters that defendants' allegations do not address whether Skinner itself was ready and willing to perform.  (#103 at 8.)   Defendants do not dispute that Skinner possessed the Vase and was ready to transfer it upon full payment, nor do they dispute that Skinner was not obliged to perform an ongoing accounting for them.  *Id.*  Skinner disputes again, however, the notion that it permitted defendants to make late payments.  *Id.* at 9.

#### b.   *Discussion.*

Defendants do not meaningfully dispute that Skinner was ready and willing to perform its end of the bargain.  They do not, nor could they on the present record, assert that Skinner did not actually possess the Vase, or that Skinner could not or would not release the Vase upon payment

---

[27] Defendants further argue, again, that Skinner failed to put forth any evidence to support its belief that defendants' payments were suspicious.  (#88-1 at 20-22.)   As discussed above, Skinner's breach of contract claim does not rest on the legitimacy of defendants' payments, so this argument is inapposite.  Moreover, there is adequate evidence in the record to create a material dispute of fact as to whether defendants' payments were legitimate or whether Skinner's belief that they were suspicious was justified.  *See supra* at 26-27.

in full.  *Cf.* #101-1 at Ex. 89 (final invoice to second bidder showing $0.00 balance); Ex. 90 (payment confirmation); Ex. 91.  There is also inadequate evidence in the record to prove that Skinner prevented defendants from enjoying the fruits of their contract.  As discussed above, the evidence shows that defendants did not provide Skinner with the necessary paperwork to remove sales tax from the invoice until July 7, 2020.  Skinner was under no obligation to provide defendants with an updated invoice before then, and any claim that Skinner's failure to do so prevented defendants from performing is belied by defendants' own intentions to pay only the invoice without the sales tax.  Additionally, Skinner provided defendants with numerous updated invoices throughout the sale, undercutting defendants' claim that Skinner avoided them and refused to confirm receipt of their wires.  Skinner was not obliged to provide payment-by-payment confirmations, especially considering Skinner made clear (and Mr. Li understood) that Skinner required full, not partial, payments.

For the reasons discussed above in relation to Skinner's motion (#85), there remains a material dispute of fact as to whether Skinner waived its rights under or otherwise modified the COS.  This dispute prevents Skinner from winning its claim on summary judgment, but defendant has pointed to no evidence of Skinner's bad faith that would prevent plaintiff from putting the question before a factfinder.  Defendants' motion is denied as to Counts I and II.

### ii.    *Skinner's breach of the implied covenant of good faith and fair dealing claims – Counts III & IV*

Defendants argue that Skinner cannot win its breach of the implied covenant of good faith and fair dealing claims because there is no evidence in the record to support a finding that defendants' payments were "improper, illegitimate, obtained illegally or 'tainted' in any way." (#88-1 at 22-23.)  As discussed above, there is adequate evidence for summary judgment purposes

to put this very question to a jury. *See supra* at 26-27.  Defendants' motion is denied as to Counts III and IV of Skinner's amended complaint (#35).

### iii.     *Skinner's violation of Chapter 93A § 11 claims – Counts V & VI*

Defendants argue Skinner's Chapter 93A claims must fail for the same reasons they claim plaintiff's breach of contract and breach of the implied covenant claims fail.  (#88-1 at 23-24 ("These [Chapter 93A] claims must fail because Skinner's G.L. c. 93A claim [sic] is predicated on the same facts that form the basis of its breach of Contract and Covenant of good faith and fair dealing claims.").)  Those claims survive summary judgment, so, applying defendants' own argument, Skinner's Chapter 93A claims do, too.  Defendants' motion is denied as to Counts V and VI of Skinner's amended complaint (#35).[28]

### iv.     *Skinner's fraudulent misrepresentation claims – Counts VII & VIII*

Defendants argue Skinner cannot establish a prima facie claim for fraudulent misrepresentation because (i) Mr. Li's allegedly fraudulent statements were statements of future intent, and (ii) Skinner cannot show that defendants knew those statements were false when made. (#88-1 at 24.)  Defendants also argue that Skinner cannot establish reasonable reliance as a matter of law.  (#88-1 at 24-25.)

As discussed above, many of the statements upon which Skinner bases its claims were not statements of future intent, but rather representations that certain transfers had already been made (though not yet received by Skinner).  Moreover, there is enough evidence in the record to support

---

[28] To the extent defendants attempt to preclude Skinner from seeking attorneys' fees allowed by statute, (#88-1 at 26-27), defendants' motion is denied.  *Hyannis Anglers Club. Inc. v. Harris Warren Comm. Kitchens, LLC*, 78 N.E. 3d 784, 791-92 (Mass. App. Ct. 2017) ("General Laws c. 93A, § 11, provides that ''reasonable attorneys' fees and costs' shall be awarded if a judge finds that a defendant has violated the statute, regardless of the amount in controversy.'" (quoting *Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co.,* 837 N.E.2d 1121 (Mass. 2005), and G. L. c. 93A, § 11).

a finding that defendants knew that the statements were false, even where they merely promised to pay by a date certain. For instance, numerous wires for which Mr. Li sent receipts failed to arrive; defendants' hollow promises to pay directly followed Skinner's threats to cancel the sale; and defendants secured a shipper to pick up the Vase without receiving confirmation that their final wire had arrived with Skinner. Additionally, as discussed *supra*, Skinner has presented enough evidence to create a dispute of material fact as to its reasonable reliance.[29] Defendants' motion as to Counts VII and VIII of Skinner's amended complaint (#35) is denied.

### v.    *Skinner's declaratory judgment claim – Count IX*

Defendants attempt to circumvent Fed. R. Civ. P. 15(a) by pleading a counterclaim for declaratory judgment in their moving papers. (#88-1 at 25-26.) This is improper. *See Ellis v. North Andover Pub. Sch.*, 569 F. Supp. 3d 61, 65 (D. Mass. 2021) ("[T]he appropriate method by which to advance a new claim that arises out of discovery is to amend the complaint, as provided for under Fed. R. Civ. P. 15(a)."). Defendants' motion is denied as to Count IX of the amended complaint (#35).

### vi.    *Defendants' breach of contract counterclaim – Counterclaim I*

Defendants claim that Skinner breached the COS by first, cancelling the contract without a proper basis and second, retaining the funds that defendants had submitted for payment. (#88-1 at 27-29.) Plaintiff argues that it never waived its rights under or modified the COS, and thereby retained a unilateral right to cancel the contract following defendants' failure to pay in full on the day of the auction. (#103 at 10-11.) It further claims that it has a right to retain the funds because there is a legitimate question as to whom the funds belong. *Id.* at 11-13.

---

[29] Here, too, defendants argue that plaintiff cannot show that they promised to use legitimate funds to pay for the Vase. (#88-1 at 28.) Again, the court rejects this argument.

As discussed above, first, there is a material dispute of fact as to whether Skinner waived its rights under or otherwise modified the COS.  This dispute keeps defendants from winning at this stage just as it does plaintiff, because if plaintiff did not modify the COS or waive its rights, then defendants cannot win on their cancellation theory.  Second, there is a material dispute of fact as to who owns the funds currently in Skinner's possession that keeps defendants from proving their retention theory.  If the funds are not defendants', then Skinner did not breach the COS by retaining them for the benefit of the rightful owners.  Defendants' motion is denied as to Counterclaim I of their answer and counterclaims (#40.)

## IV.   **The Motions to Strike**.

### A.  **Plaintiff's Motion to Strike Fang's Errata Sheet (#101).**

#### i.   *Parties' positions*

Plaintiff argues first that untimeliness alone is sufficient reason to strike Mr. Fang's errata sheet.  (#101 at 4-5.)  Plaintiff cites *In re Kugel Mesh Hernia Repair Patch, Litig.*, No. MDL-07-1842ML, 2010 WL 678092 (D.R.I. Feb. 24, 2010) and other non-binding cases from outside this District for the proposition that "'[t]here are no exceptions provided in Rule 30(e) to the thirty-day time frame for making changes to the deposition testimony,'" especially where defendants "provided no reason for its lateness."  *Id.* at 5 (quoting *In re Kugel Mesh*, 2010 WL 678092, at *2).  Second, plaintiff claims the errata sheet is tactical because it (i) was submitted on the summary judgment deadline, leaving plaintiff no time to respond before filing its own motion; and (ii) supports a new argument in defendants' own summary judgment brief.  *Id.* at 5-6.  Finally, plaintiff argues that although the change is immaterial to the pending summary judgment motions, the timing of the change prejudices Skinner because Skinner (i) cannot seek further discovery on this new point, including additional testimony from Mr. Fang, and (ii) prepared its summary judgment

papers with Mr. Fang's original testimony and had no opportunity to include the new testimony in its affirmative arguments. *Id.* at 6-7.

Defendants argue that they had a good faith reason for the delay, namely they needed to coordinate bilingual counsel to go over Mr. Fang's transcript with him because he does not speak English and coordinating the significant time differences between Mr. Fang and counsel exacerbated that delay. (#110 at 3-5 (citing, *inter alia*, *Porter v. Hamilton Beach/Proctor-Silex, Inc.*, No. 01-2970-MaV (W.D. Tenn. Jul. 28, 2003).) They further argue that they satisfied the substantive requirements of Fed. R. Civ. P. 30(e)—the errata sheet listed the changes and reasons for making them, and Mr. Fang signed it—and that the transcript's substantive accuracy should prevail over Skinner's "tactical machinations." *Id.* at 5-6. They claim that plaintiff could have checked the translation via the deposition video and provided the court with an accurate transcript, but instead is trying to gain a tactical advantage by striking the accurate testimony. *Id.* Notably, defendants acknowledge that the "affected testimony is not material to the pending motions for summary judgment, but may be material to the issue of damages at a later date." *Id.* at 1.

### ii. Discussion

Upon request of a party or deponent, a deponent must be allowed thirty days after being notified that the deposition transcript or recording is available in which to review the transcript or recording and, "if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them." Fed. R. Civ. P. 30(e). Such changes cannot be tactical, and when made in conjunction with a summary judgment pleading, are "analyzed under a framework similar to that of the sham affidavit rule—in other words, it would be struck unless the witness offered a proper explanation." *Maga v. Hennessy Indus., Inc.*, No. 12-cv-11423, 2014 WL 10051399, at *8 (D. Mass. Dec. 1, 2014); *see Heal v. Wells Fargo, N.A.*, 560 F. Supp. 3d 347, 359

(D. Mass. 2021) ("Because the errata sheet was submitted after the Defendants' summary judgment motions, it will be analyzed under the framework of the sham affidavit rule, which prohibits parties who have given a clear answer to an unambiguous question at deposition from creating a disputed issue of fact to avoid summary judgment by offering an affidavit which contradicts their earlier testimony without providing a satisfactory explanation of why the testimony has changed.").

Although the District of Rhode Island appears to read Fed. R. Civ. P. 30(e)'s 30-day deadline as a bright line rule, *see In re Kugel Mesh*, 2010 WL 678092, at \*2 (declining "to read a 'no prejudice' exception into Rule 30(e) and to engage in a subjective analysis of whether or not to hold a party to the plain requirements of the Rule" and striking late errata even where no prejudice shown), this District is less austere.   Nevertheless, where an untimely errata sheet contradicts previous testimony given, the court has stricken the errata.   *E.g.*, *Bruno v. Town of Framingham*, No. 08–cv–11403, 2009 WL 4062177, at \*1 (D. Mass. Nov. 20, 2009) (striking errata that were submitted the day after summary judgment motions filed and "dramatically change[d] the sworn testimony [deponent] previously gave").   It has also stricken errata sheets used to create a question of fact on summary judgment, *id.* ("Rule 30 most certainly may not be used as a tool to survive summary judgement"), and where the witness does not provide a reason for the change. *Id.* ("Additionally, [deponent] failed to give any explanation for why his testimony has changed so dramatically since his . . . deposition.").

Here, the parties largely agree that the change is immaterial to the merits of the pending motions for summary judgment. [30]   *Compare* #101 at 6 ("Skinner does not believe the proposed

---

[30] At the January 5, 2023 hearing, defense counsel walked back this position, arguing agnostically that the change may be relevant to the pending motions.   (#118.)   The court did not interpret

changed testimony is material to any motion for summary judgment pending before this Court[.]") *with* #110 at 1 ("[T]he affected testimony is not material to the pending motions for summary judgement.").  After reviewing the record, the court agrees.  It is undisputed that the COS required winning bidders to provide "proper documentation" showing that they are exempt from sales tax. (#99-1 ¶ 9; #67 at 15 ("One of the terms of the Conditions of Sale requires buyers to provide documentation if they want to claim an exemption from Massachusetts sales tax.").)  It is also undisputed that Mr. Li did not provide such documentation until July 7, 2020.  Even if Mr. Fang could have paid the invoice minus sales tax more expediently had the invoice reflected the $1.6 million balance from the beginning—a fact disputed by other evidence in the record indicating that Mr. Li only ever intended to pay the $1.6 million and did not do that until July—there is no evidence, including the errata, suggesting that Skinner was aware of Mr. Fang's purported currency transfer restrictions such that it could have leveraged them to its advantage.  As defendants note in their motion, the testimony may go to damages should they prove their prima facie case (#110 at 1), but it is immaterial to whether Skinner violated the COS, the implied covenant, or Chapter 93A.

Additionally, the errata change does not contradict Mr. Fang's previous testimony.  His original transcript stated that he "might" have been able to pay the invoice-less-sales tax without Mr. Liu; his errata states that he "would" have been able to.  The change is substantive, but not contradictory.  *Cf. Bruno*, 2009 WL 4062177, at *1 (striking errata that changed five answers from "yes" to "no" without explanation).  As such, the change is not as prejudicial as plaintiff purports— Mr. Fang's original testimony put plaintiff's counsel on notice of the issue of his ability to pay,

---

counsel's argument, however, as conceding that the change was material to defendants' position on summary judgment.  *Id.*

and counsel could have questioned Mr. Fang (or requested additional discovery) on that point at his deposition or following it.  In any event, defendants provided a legitimate explanation for the delay, namely, a translation error.  *Cf. Heal*, 560 F. Supp. 3d at 359 ("Not only would allowing such contradictory testimony thwart the sham affidavit rule, Plaintiff also did not comply with R. 30(e) by providing a reason for the amended statement on the errata sheet.").

The court is concerned about the timing of Mr. Fang's errata. Because the change is immaterial to the pending summary judgment motions, does not contradict previous testimony, and comes coupled with a legitimate explanation, however, plaintiff's motion to strike (#101) is denied.

### B.  Defendants' Motion to Strike the Motion to Strike (#109).

In light of the court's order denying (#101), defendants' counter motion is largely moot. Thus, defendants' motion to strike (#109) is denied as well.

### V.  Conclusion.

For the reasons stated above plaintiff's motion for summary judgment (#85) is granted as to defendants' Counterclaims II and III, and denied as to all other counts; defendants' motion for summary judgment (#88) is denied; plaintiff's motion to strike (#101) is denied; and defendants' motion to strike (#109) is denied.

March 2, 2023

/s/ M. PAGE KELLEY
M. Page Kelley
Chief United States Magistrate Judge